IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
January 3, 2013 Session

## HERBERT S. MONCIER v. BOARD OF PROFESSIONAL RESPONSIBILITY

**Direct Appeal from the Board of Professional Responsibility Panel**
**No. 2011-2058-2-NJ(24)**

**No. E2012-00340-SC-R3-BP - Filed May 24, 2013**

An attorney suspended from the practice of law for eleven months and twenty-nine days, with all but forty-five days of the suspension probated, was assessed costs associated with the proceedings that resulted in his suspension pursuant to Tennessee Supreme Court Rule 9, section 24.3. The attorney timely filed a petition seeking relief from costs, and a panel of the Board of Professional Responsibility convened and conducted a hearing on the petition. The panel denied the petition, and the attorney has appealed to this Court, as permitted by Rule 9, section 24.3. Having carefully and thoroughly considered the record and each of the nine issues raised, we affirm the panel's decision denying the petition for relief from costs.

**Tenn. Sup. Ct. R. 9, § 24.3 Direct Appeal; Judgment of the Board Panel Affirmed**

CORNELIA A. CLARK, J., delivered the opinion of the Court, in which GARY R. WADE, C.J., JANICE M. HOLDER, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

Herbert S. Moncier, Knoxville, Tennessee, pro se appellant.

Sandy Garrett, Nashville, Tennessee, for the appellee, Board of Professional Responsibility.

### OPINION

### Factual and Procedural Background

This case is before us on a post-disciplinary proceeding request for relief from costs. On June 1, 2011, this Court entered an Order of Enforcement suspending the law license of appellant, Herbert S. Moncier, for eleven months and twenty-nine days, with all but forty-five days of the suspension probated. We also ordered Mr. Moncier to have a practice monitor

during the probationary period of his suspension, directed him to obtain twelve additional hours of continuing legal education courses in ethics, and assessed costs against him totaling $22,038.32. This assessment was based on Tennessee Supreme Court Rule 9, section 24.3, which requires attorneys suspended as a result of formal disciplinary proceedings to pay the costs of the proceedings but permits such attorneys to seek relief from the assessment by filing a petition with the Tennessee Board of Professional Responsibility ("Board"). Mr. Moncier petitioned for relief from costs on July 5, 2011. The petition was denied on January 12, 2012. Mr. Moncier then appealed as of right to this Court. Tenn. Sup. Ct. R. 9, § 24.3.

Mr. Moncier's position before this Court remains the same as it was before the panel hearing his petition. He alleges that the disciplinary proceedings resulting in his suspension deprived him of a multitude of constitutional, statutory, and rule-based rights; and that requiring him to pay the costs of such a flawed proceeding is fundamentally unfair. To provide context for the issues Mr. Moncier has raised, we begin with an overview of the twisted procedural road this matter has traveled before arriving back in this Court.[1] Additional and more specific information will be provided as necessary in the discussion of each issue, although we will not attempt to enumerate each and every pleading that has been filed in this and related proceedings over the past several years. For clarity, we will refer to the disciplinary proceedings that resulted in Mr. Moncier's supsension as <u>Moncier I</u> and to the proceedings on Mr. Moncier's petition for relief from costs as <u>Moncier II</u>.

<u>Moncier I</u>

Mr. Moncier was licensed to practice law in Tennessee in 1970. After investigation, a petition for discipline was filed against Mr. Moncier on July 30, 2008, alleging that his conduct while representing a client during a criminal sentencing hearing on November 17, 2006, before Judge J. Ronnie Greer of the United States District Court for the Eastern

_____

[1] Tennessee Rule of Appellate Procedure 27(a)(4) requires an appellant's brief to include a section listing "[a] statement of the issues presented for review[.]" Tenn. R. App. P. 27(a)(4). Mr. Moncier has listed nine issues in this section of his brief but has raised countless other issues in the argument portion of his brief. This opinion addresses only the nine issues Mr. Moncier has appropriately raised by listing them in accordance with Rule 27(a)(4). See <u>Hodge v. Craig</u>, 382 S.W.3d 325, 335 (Tenn. 2012) (stating that failing to list issues in accordance with Rule 27(a)(4) may result in waiver).

Mr. Moncier has also made numerous requests in the argument portion of his brief for this Court to take judicial notice of records, briefs, or documents in other cases. Mr. Moncier's requests do not conform to the requirements of Tennessee Rule of Appellate Procedure 22, regarding motions. Additionally, we decline to take judicial notice of any records not introduced as exhibits in the proceedings below. See Tenn. R. Evid. 201(c); Tenn. R. App. P. 24(g).

District of Tennessee, in the matter of United States v. Vassar, Case No. 2:05-CR-75, violated seven of Tennessee's Rules of Professional Conduct.[2] See Tenn. Sup. Ct. R. 8, RPC 1.1, 1.7, 3.1, 3.4, 3.5, 4.4, and 8.4. The petition for discipline and attached exhibits comprised approximately 1000 pages. On August 12, 2008, Mr. Moncier filed a response to the petition through counsel.

On September 28, 2009, a supplemental petition for discipline was filed based on the report of a Tennessee trial court judge, Judge Dale C. Workman, of a contempt finding against Mr. Moncier on June 12, 2009, for Mr. Moncier's conduct in the Circuit Court for Knox County during the proceedings in Daniel v. Grimac, No. 1-386-06.[3] The supplemental petition alleged that Mr. Moncier's conduct in Daniel violated three Rules of Professional Conduct. Tenn. Sup. Ct. R. 8, RPC 3.4(c), 3.5(e), 8.4(a), (d). On November 20, 2009, Mr. Moncier, through counsel, filed a response to the supplemental petition.

The Board assigned a hearing panel to adjudicate the petitions. See Tenn. Sup. Ct. R. 9, § 8.2. The Moncier I hearing panel conducted a multi-day hearing at which Mr. Moncier was represented by counsel. The hearing adjourned on December 14, 2009. On January 13, 2010, the Moncier I hearing panel issued a forty-four-page judgment finding that Mr. Moncier had violated multiple provisions of the Tennessee Rules of Professional Conduct.[4] After considering the aggravating and mitigating factors relevant to punishment, the Moncier I hearing panel imposed a suspension of eleven months and twenty-nine days, with forty-five days of active suspension and the remainder served on probation.[5] The

---

[2] As a result of this same conduct, the federal courts of the Eastern District of Tennessee suspended Mr. Moncier for seven years, with five years of active suspension and two years of probation. See In re Moncier, 550 F. Supp.2d 768, 812-13 (E.D. Tenn. 2008), aff'd 329 F. App'x. 636, 637 (6th Cir. 2009).

[3] Mr. Moncier appealed the state trial court's finding of contempt in Daniel. The Court of Appeals concluded that the imposition of summary contempt was inappropriate and remanded to the trial court for further proceedings. See Daniel v. Grimac, 342 S.W.3d 511, 518-20 (Tenn. Ct. App. 2010).

[4] Specifically, the Moncier I hearing panel found that: (1) Mr. Moncier had a conflict of interest in his representation of Michael Vassar in the federal proceedings in violation of RPC 1.7; (2) Mr. Moncier disobeyed the federal district court's orders during the Vassar sentencing hearing and disrupted those proceedings in violation of RPC 3.4(c) and 3.5(e); (3) Mr. Moncier violated the ruling of the trial court in Daniel by improperly interjecting questions about an ordinance violation, in violation of RPC 3.4(c), 3.5(e), and 8.4(a) and (d); and (4) Mr. Moncier intended to disrupt the proceedings in Daniel in violation of RPC 3.5(e) and 8.4(d).

[5] The hearing panel found as aggravating factors: (1) Mr. Moncier's selfish motive in representing multiple criminal defendants and creating a conflict of interest with his representation of Michael Vassar; (2) Mr. Moncier's pattern of misconduct; (3) Mr. Moncier's substantial experience in the law; and (4) Mr.
(continued...)

-3-

Moncier I hearing panel also directed Mr. Moncier to obtain an additional twelve hours of continuing legal education in ethics and to secure a practice monitor for the probationary period of his suspension.

On March 15, 2010, Mr. Moncier filed in the Circuit Court for Knox County a petition for writ of certiorari seeking judicial review of the Moncier I hearing panel decision pursuant to Tennessee Supreme Court Rule 9, section 1.3. At that time, section 1.3 provided, in relevant part, as follows: "The respondent-attorney . . . or the Board may have a review of the judgment of a hearing panel in the manner provided by Tenn. Code Ann. § 27-9-101 et seq., except as otherwise provided herein."[6]

On September 8, 2010, the senior judge assigned to hear Mr. Moncier's appeal, see Tenn. Sup. Ct. R. 9, § 1.5, issued a thirty-eight-page memorandum opinion, which affirmed in part, reversed in part, and remanded the matter to the Moncier I hearing panel "for reconsideration of the imposed discipline in light of the dismissal of some of the charges."[7] Mr. Moncier filed a motion to alter or amend, which the trial court denied on October 26, 2010. Neither the Board nor Mr. Moncier sought an appeal to this Court from the trial court's decision.

On December 20, 2010, before the Moncier I hearing panel issued an opinion on remand, this Court held, in another case, that Rule 9, section 1.3 designates the petition for writ of certiorari as the mechanism for seeking judicial review of hearing panel decisions and explained that a petition for writ of certiorari is not effective to confer subject matter jurisdiction upon a trial court unless the petition is "supported by oath or affirmation." Bd. of Prof'l Responsibility v. Cawood, 330 S.W.3d 608, 609 (Tenn. 2010). We dismissed the Board's appeal in Cawood because the petition for writ of certiorari the Board filed in the trial court was not supported by oath or affirmation and was, therefore, insufficient to confer

---

[5](...continued)
Moncier's refusal to acknowledge the wrongfulness of his conduct. The hearing panel found as mitigating factors: (1) Mr. Moncier's lack of a prior disciplinary record; (2) Mr. Moncier's full and free disclosure and cooperative attitude; and (3) the lengthy suspension already imposed by the federal courts.

[6] On May 2, 2011, Rule 9, section 1.3 was amended, and it now provides that "[a] petition under this section shall be made under oath or on affirmation and shall state that it is the first application for the writ."

[7] The trial court found that the record lacked substantial material evidence to support the Moncier I hearing panel's finding that Mr. Moncier had a conflict of interest in his representation of Michael Vassar in federal court. The trial court also reversed the hearing panel's finding that Mr. Moncier improperly interjected questions concerning an ordinance violation during the punitive damages phase of Daniel because the supplemental petition had failed to clearly and specifically inform Mr. Moncier of that charge. See Tenn. Sup. Ct. R. 9, § 8.2.

jurisdiction on the trial court.  <u>Id.</u>  On December 30, 2010, the Board filed a petition for rehearing of the <u>Cawood</u> decision, arguing that the requirements generally applicable to petitions for writs of certiorari had not been applied to petitions seeking judicial review pursuant to Rule 9, section 1.3 before <u>Cawood</u>.

On January 7, 2011, while the Board's <u>Cawood</u> petition for rehearing was pending in this Court, and almost four months after his case had been remanded to the <u>Moncier I</u> hearing panel for reconsideration, Mr. Moncier returned to the <u>Moncier I</u> trial court and asked for permission to amend his petition for writ of certiorari to incorporate the "Tenn. Code Ann. § 27-8-106 Verification filed herewith."  The trial court denied Mr. Moncier's motion the same day it was filed.  On January 31, 2011, this Court denied the Board's petition for rehearing of <u>Cawood</u>.

In early February 2011, the Board filed a Tennessee Rule of Civil Procedure 60.02 motion in the <u>Moncier I</u> trial court asking the trial court to vacate its September 8, 2010 judgment and dismiss Mr. Moncier's appeal for lack of subject matter jurisdiction.  Relying on <u>Cawood</u> and Rule 9, section 1.3, the Board argued that, because Mr. Moncier's petition for writ of certiorari to the trial court was not supported by oath or affirmation, the trial court never acquired subject matter jurisdiction to review the <u>Moncier I</u> hearing panel decision.

Mr. Moncier responded to the Board's motion by filing with the <u>Moncier I</u> trial court his own Rule 60.02 motion, as well as a petition for declaratory judgment.  Mr. Moncier asked the trial court to vacate its September 8 and October 26, 2010 orders and direct the <u>Moncier I</u> hearing panel to vacate and re-enter its January 13, 2010 judgment.  These actions, Mr. Moncier asserted, would allow him to begin the judicial review process anew and provide him an opportunity to file a petition for writ of certiorari compliant with Rule 9, section 1.3 and <u>Cawood</u>.

On February 9, 2011, while the trial court considered the competing Rule 60.02 motions, Mr. Moncier filed a similar motion with the <u>Moncier I</u> hearing panel, asking it to withdraw and immediately re-enter its January 13, 2010 judgment. Mr. Moncier alleged that this action would begin anew his time for seeking judicial review and allow him an opportunity to file a petition for writ of certiorari compliant with Rule 9, section 1.3 and <u>Cawood</u>.

On February 18, 2011, the <u>Moncier I</u> trial court granted the Board's Rule 60.02 motion,[8] vacated its September 8, 2010 judgment, and dismissed Mr. Moncier's appeal, explaining its decision as follows:

> The issue before the Court is simple: Mr. Moncier's petition did not comply with Tenn. Code Ann. § 27-8-106 [footnote omitted]. This Court therefore never had jurisdiction[:] the appeal was a nullity, and this Court's ruling of September 8, 2010[,] was equally a nullity. Mr. Moncier has lost his opportunity to appeal the [h]earing [p]anel's decision.

The trial court rejected Mr. Moncier's argument that <u>Cawood</u> should be applied prospectively, pointing out that prospective application would be inconsistent with this Court's application of <u>Cawood</u> in <u>Nebel v. Bd. of Prof'l Responsibility</u>, No. M2010-00420-SC-R3-BP, 2011 WL 197868, at *1 (Tenn. Jan. 21, 2011). The trial court also denied Mr. Moncier's request for re-entry of its prior order, describing this request as "an imaginative attempt to sidestep the holdings in <u>Cawood</u>, <u>supra</u>, and <u>Nebel</u>, <u>supra</u>." [9]

Twelve days later, on March 2, 2011, the <u>Moncier I</u> hearing panel declined to take any action on Mr. Moncier's motion requesting re-entry of its January 13, 2010 judgment. Mr. Moncier subsequently filed a petition in the Circuit Court for Knox County, seeking judicial review of this panel decision.

While Mr. Moncier's petition for judicial review was pending in the Knox County trial court, the Board submitted to this Court on March 9, 2011, a protocol memorandum and proposed order of enforcement against Mr. Moncier.[10] Several exhibits were attached to the

_____

[8] The trial court "assume[d]" the motion was filed pursuant to Tennessee Rule of Civil Procedure 60.02(3) or 60.02(5), which provide, in relevant part, as follows:

> On motion and upon such terms as are just, the court may relieve a party . . . from a final judgment, order or proceeding for the following reasons: . . . (3) the judgment is void; . . . (5) any other reason justifying relief from the operation of the judgment.

[9] Mr. Moncier initiated judicial proceedings in a variety of venues after the trial court granted the Board's Rule 60.02 motion. We refer to these separate judicial proceedings only as necessary to address the issues Mr. Moncier raises in this appeal.

[10] Where no appeal is "perfected" from the judgment of a hearing panel suspending an attorney for any period of time in excess of three months, "the Board shall forward a copy of the judgment or settlement
(continued...)

protocol memorandum, including: the original and supplemental petitions for discipline, the judgment of the Moncier I hearing panel, and an eleven-page invoice itemizing costs totaling $22,038.32. The invoice included billing charges for time spent by Disciplinary Counsel from November 2006 to March 2011. The proposed order of enforcement incorporated the findings and discipline set out in the January 13, 2010 judgment of the Moncier I hearing panel and also included a provision assessing all of the itemized costs to Mr. Moncier.[11]

While the proposed order of enforcement was pending in this Court, Mr. Moncier filed a notice of appeal to this Court from the Moncier I trial court's February 18, 2011 order granting the Board's Rule 60.02 motion, vacating the September 8, 2010 order, and dismissing Mr. Moncier's case based on Cawood. Mr. Moncier's appeal was assigned case number E2011-00616-SC-R3-BP.

After filing this notice of appeal, Mr. Moncier turned his attention to the Board's proposed order of enforcement pending before this Court. On March 14, 2011, he filed a motion for stay of enforcement of discipline pending the resolution of his appeal in case number E2011-00616-SC-R3-BP and, alternatively, requested permission to respond to the Board's protocol memorandum and proposed order of enforcement. On March 29, 2011, the Board filed a response in opposition to Mr. Moncier's motion for stay.

On April 21, 2011, the Knox County Circuit Court dismissed Mr. Moncier's petition seeking judicial review of the Moncier I hearing panel's refusal to vacate and re-enter its January 10, 2010 judgment. Mr. Moncier filed a notice of appeal in this Court from the trial court's order, and this appeal was assigned case number E2011-01090-SC-R3-BP. Thus, this Court had pending three separate cases involving the same hearing panel decision suspending Mr. Moncier.

---

[10](...continued)
to the Supreme Court of Tennessee." Tenn. Sup. Ct. R. 9, § 8.4.

> The Court shall review the recommended punishment provided in such judgment or settlement with a view to attaining uniformity of punishment throughout the state and appropriateness of punishment under the circumstances of each particular case. The Court may direct that the transcript or record of any proceeding be prepared and filed with the Court for its consideration. Id.

Because Mr. Moncier's appeal was not "perfected," review under section 8.4 was appropriate.

[11] This matter was assigned appellate case number M2011-00595-SC-BPR-BP.

On April 26, 2011, this Court denied Mr. Moncier's request for a stay but granted him permission to file a response to the protocol memorandum and proposed order of enforcement. On May 9, 2011, Mr. Moncier filed a response in excess of fifty pages, not including the attached exhibits. The response listed fifteen issues, none of which challenged the Board's proposal to assess all itemized costs to Mr. Moncier. In addition to his response, on May 10, 2011, Mr. Moncier filed six motions seeking additional relief.[12] On May 24, 2011, the Board responded to each of Mr. Moncier's motions and also moved to dismiss Mr. Moncier's appeals in case numbers E2011-00616-SC-R3-BP and E2011-01090-SC-R3-BP.

This Court entered the Order of Enforcement on June 1, 2011, which incorporated the punishment included in the <u>Moncier I</u> hearing panel judgment and assessed costs of $22,038.32 against Mr. Moncier. The June 1, 2011 Order of Enforcement also denied Mr. Moncier's six motions. By separate orders also entered on June 1, 2011, we granted the Board's motions to dismiss Mr. Moncier's separate appeals.

On June 9, 2011, Mr. Moncier filed in this Court a petition for rehearing of the June 1, 2011 Order of Enforcement and also alternatively requested removal of the practice monitor requirement and limited relief from Tennessee Supreme Court Rule 9, sections 18.1 and 18.7.

---

[12] Mr. Moncier's motions were titled as follows:

> (1) Motion For This Court To Assume Jurisdiction of Respondent's Appeal As of Right From Knox County Criminal Court #96518 And To Consolidate That Appeal With This Case;
>
> (2) Motion For Uniformity-of-Punishment Discovery and to Supplement the Record;
>
> (3) Motion To Consolidate Case E2011-00616-SC-R3-BP with this Case;
>
> (4) Motion to Dismiss or, in the Alternative For An Order for the Parties to Prepare a Joint Record;
>
> (5) Motion For This Court To Await Final Orders And Appeals As of Right In Two Additional Cases Pending in Trial Courts So As To Assume Jurisdiction And To Consolidate Those Appeals With This Case; and
>
> (6) Motion to Consolidate Case E2011-******-SC-R3-BP With This Case.

Mr. Moncier also requested a stay pending resolution of his petition for rehearing and pending federal review. Mr. Moncier's petition for rehearing and request for a stay were denied by a June 14, 2011 order. Shortly after this order was filed, the Appellate Court Clerk's Office received from Mr. Moncier a "supplement to petition to rehear." By a June 21, 2011 order, we dismissed the supplement and directed Chief Disciplinary Counsel to close any new investigatory files that, according to Mr. Moncier, had been opened as a result of Mr. Moncier's having identified himself as an attorney when he submitted the supplement. We described the June 21, 2011 order as marking "the conclusion" of Mr. Moncier's disciplinary proceedings.

### Moncier II

Fourteen days later, on July 5, 2011, Mr. Moncier filed a petition for relief from the costs assessed in the June 1, 2011 Order of Enforcement. Tenn. Sup. Ct. R. 9, § 24.3. The petition did not allege any specific grounds in support of the requested relief. The Board responded to the petition on July 19, 2011. On that same date, a panel of the Board, consisting of three attorneys, was designated to hear the petition.

A hearing on the petition was initially scheduled for September 28, 2011, but was continued until December 13, 2011, upon motion of the Board. On November 21, 2011, Mr. Moncier filed a motion for summary judgment and/or declaratory judgment. On December 2, 2011, the Board submitted a response to the pleading. From December 7 to December 12, 2011, Mr. Moncier filed a series of motions, petitions, and applications, including: (1) a motion for relief from costs by remedial and equitable relief; (2) a motion to disqualify panel members; (3) a supplemental motion to disqualify panel members; (4) an appeal and motion for review to the en banc Board from the rulings of the chair of the panel; (5) an application to the Board for issuance and service of subpoenas *ad testificatium* and *duces tecum* for the hearing; and (6) a motion asking the panel to take judicial notice of and make an exhibit to the hearing the record from Moncier I. In addition, Mr. Moncier filed a pre-hearing memorandum and a supplement to his petition, alleging various specific grounds in support of his request for relief. The Board responded to each of Mr. Moncier's pleadings.

At a day-long hearing before the Moncier II panel on December 13, 2011, Mr. Moncier took the position that the disciplinary proceedings in Moncier I deprived him of a multitude of constitutional, statutory, and rule-based rights and that requiring him to pay the costs of the flawed proceedings would be fundamentally unfair. Mr. Moncier gave a lengthy opening statement, which he later adopted as his testimony, enumerating the various specific ways he believed the proceedings in Moncier I were unfair, illegal, or unconstitutional.

-9-

Mr. Moncier candidly acknowledged having the means to pay the assessed costs, but he also described the financial difficulties he had experienced as a result of the seven-year federal suspension. Mr. Moncier did not challenge any particular cost as excessive, unnecessary, or unreasonable, nor did he argue that the charges for Disciplinary Counsel's time were inflated. Mr. Moncier objected, however, to paying any costs incurred after December 11, 2009.[13] On that date, according to Mr. Moncier, Disciplinary Counsel and staff of the Board interfered with his right to have an attorney of his own choosing by opening an investigation of the attorney representing him before the Moncier I hearing panel during the hearing. Mr. Moncier did not further explain how the existence of this investigation prevented the attorney from representing him.

Twenty exhibits were introduced at the Moncier II hearing. Ten more, some of which were collective, were filed after the hearing. The exhibits included documents Mr. Moncier had previously filed with this Court, the Board, or the Moncier I hearing panel, as well as documents filed in, or related to, the various lawsuits Mr. Moncier had initiated in federal and state courts as a result of the proceedings in Moncier I.

Moncier also filed several additional motions after the hearing, including: (1) a renewed motion to recuse panel members; (2) a supplemental motion to recuse panel members and to abate the proceeding pending other proceedings; and (3) a second supplemental motion to disqualify panel members. The Board responded to every motion. On January 12, 2012, the Moncier II panel issued an order denying these motions and Mr. Moncier's petition, finding no basis to grant him relief from costs.

On February 10, 2012, Mr. Moncier filed in this Court a "petition for judicial review pursuant to Tenn. R. Sup. Ct. Rule 9, §§ 24.3 and 1.3." Three days later, Mr. Moncier filed a "motion for this Court to determine the sufficiency of the affirmation" to his petition for judicial review. In a February 28, 2012 order, this Court explained that Rule 9, section 1.3 affords an appeal as of right to this Court, which is governed by the Tennessee Rules of Appellate Procedure, and that Mr. Moncier's petition for judicial review satisfied the requirements of Tennessee Rule of Appellate Procedure 4, concerning a notice of appeal. By the same order, however, we cautioned Mr. Moncier against using "this appeal as a means by which to retry his underlying disciplinary case, which was concluded by this Court's Order of Enforcement filed June 1, 2011."

---

[13] More than half of the costs, $12,955.49, were incurred after December 11, 2009.

-10-

**Standard of Review**

Mr. Moncier has appealed from the Moncier II panel's decision pursuant to Rule 9, section 1.3. See Tenn. Sup. Ct. R. 9, § 24.3. When reviewing a decision under Rule 9, section 1.3, we apply the same standard of review as that applied by a trial court reviewing a hearing panel's decision. Bd. of Prof'l Responsibility v. Cowan, 388 S.W.3d 264, 267 (Tenn. 2012). We will reverse or modify the decision of the panel only if

> the rights of the petitioner have been prejudiced because the panel's findings, inferences, conclusions or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the panel's jurisdiction; (3) made upon unlawful procedure; (4) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or (5) unsupported by evidence which is both substantial and material in the light of the entire record.

Tenn. Sup. Ct. R. 9, § 1.3. We review questions of law de novo but do not substitute our judgment for that of the panel as to the weight of the evidence on questions of facts. Id.; see also Cowan, 388 S.W.3d at 267.

**Analysis**

Assessment of Costs Under Rule 9, Section 24.3

The attorney disciplinary process is a costly endeavor. A large portion of the registration fees paid by attorneys who strive each day to follow ethical guidelines is now used to pay for the disciplinary mechanism necessary to police those attorneys who do not comply with the Rules of Professional Conduct. Shifting the financial burden of formal disciplinary proceedings to those directly responsible for the costs is equitable and "serves the additional function of deterring other lawyers from engaging in unprofessional conduct." In re Shannon, 876 P.2d 548, 575 (Ariz. 1994). To fulfill these purposes, Tennessee Supreme Court Rule 9, section 24.3 provides:

> In the event that a judgment of . . . suspension . . . results from formal proceedings, the Board shall assess against the respondent the costs of the proceedings, including court reporter's expenses for appearances and transcription of all hearings and depositions, the expenses of the hearing panel in

the hearing of the cause, and the hourly charge of Disciplinary Counsel in investigating and prosecuting the matter.

The respondent attorney may petition the Board for relief from costs within thirty days of receipt of the final bill of costs or on the termination of any action upon which the disciplinary proceeding was based, whichever occurs last. In seeking relief, the respondent attorney shall have the opportunity to appear and be heard before the Board or a duly constituted panel thereof. Having conducted such a hearing, the Board shall file an order within thirty days; this order must include the basis for the Board's decision. An order reflecting the decision shall be treated as a decree of the circuit or chancery court and, as such, is appealable to the Tennessee Supreme Court under Rule 9, § 1.3, Rules of the Supreme Court. . . .

The hourly charges of Disciplinary Counsel on formal proceedings filed on or after January 27, 1992, shall be assessed at $30 per hour for investigative time incurred prior to the filing of formal proceedings and $80 per hour in connection with formal proceedings.

Payment of the costs assessed by the Board pursuant to this rule shall be required as a condition precedent to reinstatement of the respondent attorney.

Tenn. Sup. Ct. R. 9, § 24.3.

Rule 9, section 24.3 is quite specific as to the types of expenses that may be assessed as costs and the hourly rate that may be charged for Disciplinary Counsel's time. In contrast, the rule does not limit the grounds an attorney may advance when seeking relief from a costs assessment. Attorneys who seek relief from costs typically allege extreme financial hardship, or argue that a partial reduction is warranted because not all of the alleged ethical violations were proven, or challenge the necessity and/or reasonableness of particular costs. See, e.g., Lufkin v. Bd. of Prof'l Responsibility, 336 S.W.3d 223, 225 (Tenn. 2011) (seeking relief from costs based on extreme financial hardship); Brown v. Bd. of Prof'l Responsibility, 29 S.W.3d 445, 448 (Tenn. 2000) (seeking relief from costs based on Disciplinary Counsel's failure to prevail on all of the alleged ethical violations and the fact that sixty percent of the fees were paid to outside counsel engaged by the Board).

Mr. Moncier's appeal is not typical. Consistent with his performance throughout these disciplinary proceedings, Mr. Moncier has distorted the simple, single issue at the heart of this appeal—whether the costs assessed to a disciplined attorney should be waived or reduced—into nine issues, with multiple subparts. Despite this Court's admonition, Mr. Moncier has used this appeal as a means for attempting to re-litigate Moncier I, which was concluded by the June 1, 2011 Order of Enforcement. Mr. Moncier has not asserted the usual grounds in support of his request for relief from costs. Indeed, Mr. Moncier has candidly acknowledged having the means to pay the assessed costs, even though he has experienced financial difficulties from the seven-year federal suspension. While he has not challenged any particular cost as excessive, unnecessary, or unreasonable, he has argued that a partial reduction of costs is warranted. This argument is based, however, on findings in the September 8, 2010 trial court judgment in Moncier I, which was later set aside as a nullity. Mr. Moncier argues that he should not be responsible for costs incurred after December 11, 2009, when the Board opened an investigation of the attorney representing him before the Moncier I hearing panel. Finally, Mr. Moncier is alleging that relief from costs is appropriate because the Moncier I disciplinary proceedings were fundamentally flawed and unfair in numerous ways. Although Mr. Moncier raised many of these issues in Moncier I, we will address them briefly—and finally—again for the benefit of the public and the bar.

## Constitutional Challenges to Tennessee Supreme Court Rule 9, section 24.3

### A. Void for Vagueness

Mr. Moncier argues that Rule 9, section 24.3 is unconstitutionally vague in violation of article I, section 8 of the Tennessee Constitution and the Fourteenth Amendment of the United States Constitution because it fails to define "relief" from costs and provides no standards to guide this Court's review of panel decisions. We disagree.

Laws that "regulate persons or entities must give fair notice of conduct that is forbidden or required." FCC v. Fox Television Stations, Inc., __ U.S. __, 132 S. Ct. 2307, 2317 (2012) (citing Connally v. Gen. Constr. Co., 269 U.S. 385, 391 (1926)). "[T]he root of the vagueness doctrine is a rough idea of fairness." Colten v. Kentucky, 407 U.S. 104, 110 (1972). A law is void for vagueness if it fails either to give a person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited or to provide sufficient standards for enforcement. See City of Chicago v. Morales, 527 U.S. 41, 52 (1999); Grayned v. City of Rockford, 408 U.S. 104, 108-09 (1972); see also Phillips v. Bd. of Regents, 863 S.W.2d 45, 48-50 (Tenn. 1993) (discussing the void-for-vagueness doctrine). A law is not void for vagueness if an "'ordinary person exercising ordinary common sense' can sufficiently understand the law and comply with [it.]" Arnett v. Kennedy, 416 U.S. 134,

159 (1974) (quoting Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, 413 U.S. 548, 578-79 (1973)).

To support his vagueness argument, Mr. Moncier relies upon Giaccio v. Pennsylvania, 382 U.S. 399 (1966). Giaccio involved an 1860 Pennsylvania statute, which applied in all misdemeanor criminal cases and required juries in all cases of acquittals to "determine . . . whether the county, or the prosecutor, or the defendant shall pay the [court] costs." Id. at 400-01. Acquitted defendants against whom costs were assessed were committed to jail until the costs were paid. Id. at 401. Although the statute provided no standards, Pennsylvania's courts had interpreted it as allowing for the imposition of costs only if a jury found the acquitted defendant's conduct "reprehensible in some respect, improper, [or] outrageous to morality and justice[.]" Id. at 404 (internal quotation marks omitted).

The United States Supreme Court in Giaccio declared the statute as written and as interpreted by Pennsylvania's courts void for vagueness because it failed to provide any definite standards to govern a jury's assessment of costs. Id. at 403-05. The Court emphasized that the "loose and unlimiting terms" used by Pennsylvania's courts to interpret the statute that "imposed forfeitures, punishments or judgments for costs" failed "to measure up to the requirements of the Due Process Clause." Id. at 404.

Unlike the statute at issue in Giaccio, Rule 9, section 24.3 does not authorize the standardless assessment of costs. Rather, it allows attorneys to seek *relief* from costs already assessed pursuant to very specific standards. Mr. Moncier has failed to provide any authority for the proposition that laws affording parties an avenue for seeking *relief* from costs must define precisely the grounds for seeking relief to withstand a void-for-vagueness constitutional challenge.

Notwithstanding Mr. Moncier's failure to supply any authority supporting his argument, we conclude that even if the void-for-vagueness doctrine is implicated in these circumstances, Rule 9, section 24.3 suffers from none of the deficiencies of the statute in Giaccio. Rather, Rule 9, section 24.3 allows for the assessment of costs only if formal disciplinary proceedings have resulted in "a judgment of disbarment, suspension, public censure, private reprimand, temporary suspension, disability inactive status, reinstatement, or denial of reinstatement." Tenn. Sup. Ct. R. 9, § 24.3. The Board has no discretion to determine to whom costs should be assessed. The types of expenses for which costs may be assessed are specifically enumerated to include "court reporter's expenses for appearances and transcription of all hearings and depositions, the expenses of the hearing panel in the hearing of the cause, and the hourly charge of Disciplinary Counsel in investigating and prosecuting the matter." Id. The hourly rates at which Disciplinary Counsel's time may be charged are prescribed at "$30 per hour for investigative time incurred prior to the filing of

formal proceedings and $80 per hour in connection with formal proceedings." Id. Attorneys are notified of their rights to petition for relief from costs and to appear and be heard on such petitions, and petitions must be resolved by written decisions within thirty days of hearings. Id. We are convinced that an "ordinary person exercising ordinary common sense" would have no difficulty understanding Rule 9, section 24.3 and availing himself of the opportunity it provides to seek relief from costs. Arnett, 416 U.S. at 159 (internal quotation marks omitted). The lack of specificity regarding the grounds for relief actually inures to the benefit of disciplined attorneys, like Mr. Moncier, who are not precluded from conceiving of and advancing various atypical arguments in support of a request for relief from costs.

We also reject Mr. Moncier's argument that Rule 9, section 24.3 fails to provide standards for this Court's review of a panel's decision on a petition for relief from costs. As already explained, an appeal from a panel's decision is governed by Rule 9, section 1.3, which provides specific standards to govern our review. Tenn. Sup. Ct. R. 9, § 1.3; Cowan, 388 S.W.3d at 267. Mr. Moncier's arguments that Rule 9, section 24.3 is unconstitutionally vague are without merit.

## B. Lack of Notice and a Hearing

Mr. Moncier next argues that his state and federal due process rights were violated because (1) he was not given notice that the costs of his disciplinary proceeding would be assessed against him; and (2) he was not afforded a hearing before being assessed the costs.

Two of the "essential requirements of due process . . . are notice and an opportunity to respond." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1985). "The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement." Id.; see also Heyne v. Metro. Nashville Bd. of Public Educ., 380 S.W.3d 715, 732 (Tenn. 2012).

Mr. Moncier's contention that he was denied notice and an opportunity to be heard before costs were assessed against him is wholly without merit. First of all, the Tennessee Rules of Professional Conduct, as well as the decisions of this Court applying them, provide ample notice as to the types of misconduct that may result in the institution of formal disciplinary proceedings. Tenn. Sup. Ct. R. 8. Similarly, Rule 9, section 24.3 itself notifies lawyers that if formal disciplinary proceedings result in "a judgment of disbarment, suspension, public censure, private reprimand, temporary suspension, disability inactive status, reinstatement, or denial of reinstatement," the lawyer subject to the judgment shall be responsible for paying the costs of the proceeding. Tenn. Sup. Ct. R. 9, § 24.3; see also See Walker v. Bd. of Prof'l Responsibility, 38 S.W.3d 540, 549-50 (Tenn. 2001) ("All attorneys subject to discipline have the opportunity to read [section 24.3] carefully.").

Mr. Moncier also received specific notice of the costs proposed to be assessed against him when the Board filed its proposed order of enforcement, protocol memorandum, and invoice with this Court on March 9, 2011. Paragraph 7 of the proposed order of enforcement stated:

> Pursuant to Supreme Court Rule 9, Section 24.3, [Mr. Moncier] shall pay to the [Board] the expenses and costs of this matter in the amount of $22,038.32, and in addition, shall pay to the Clerk of this Court the costs incurred herein, within (90) days of the entry of this Order, for all of which execution may issue if necessary.

The eleven-page invoice attached to the Board's protocol memorandum provided an itemization of costs. Mr. Moncier requested and received permission to respond to the Board's proposed order of enforcement and protocol memorandum. Although Mr. Moncier filed on May 9, 2011, a response in excess of fifty pages, which included fifteen issues, he did not contest the Board's proposed assessment of costs against him. The record indisputably demonstrates that Mr. Moncier received notice and had an opportunity to be heard in this Court *before* costs were assessed against him. Mr. Moncier's failure to prehend that opportunity does not amount to denial of due process.

Mr. Moncier has also received extensive post-assessment process. See Phillips, 863 S.W.2d at 50-51 (discussing the effect of post-deprivation process). Specifically, Mr. Moncier has not been required to tender payment while prosecuting his petition for relief from costs. He has appeared and presented proof in support of his petition at a day-long hearing before the Moncier II panel. He has been permitted to assert broad, atypical grounds in support of his petition. He has been allowed to file numerous pre-hearing and post-hearing motions with the Moncier II panel. He has appealed from the decision of the Moncier II panel to this Court, filed a lengthy opening brief addressing myriad issues, filed a reply brief, and presented oral argument to this Court. It is difficult to conceive of what additional process Mr. Moncier could possibly be entitled to receive.

Subject Matter Jurisdiction

A. Board's Failure to Assess Costs

Rule 9, section 24.3 states that "the Board shall assess against the [attorney] the costs of the proceedings[.]" Mr. Moncier argues that this language requires Disciplinary Counsel to submit an application for costs and expenses to the Board and obtain the Board's approval of the request before asking this Court to include an assessment of costs against a disciplined

-16-

attorney in an order of enforcement. According to Mr. Moncier, Disciplinary Counsel did not follow this process in Moncier I; thus, this Court lacked subject matter jurisdiction to assess costs against him in the June 1, 2011 Order of Enforcement.

Mr. Moncier's argument is not well-taken. As already explained, the text of Rule 9, section 24.3 *requires* the assessment of costs against attorneys subject to a judgment resulting from formal disciplinary proceedings, defines the types of costs that must be assessed, and sets the hourly rate at which Disciplinary Counsel's time may be assessed. Rule 9, section 24.3 neither mandates the two-step process Mr. Moncier proffers nor prescribes the mechanism by which the Board must fulfill its responsibility to assess costs. In Moncier I, the Board satisfied Rule 9, section 24.3 by preparing and submitting a proposed order of enforcement and a detailed eleven-page invoice itemizing the costs included in the proposed order. The invoice obviously was prepared before this Court entered the June 1, 2011 Order of Enforcement. Nothing more is required. Mr. Moncier's argument that this Court lacked subject matter jurisdiction to include an assessment of costs in the June 1, 2011 Order of Enforcement is without merit.

## B. Pendency of Other Appeals

Mr. Moncier also contends that this Court lacked subject matter jurisdiction to enter the June 1, 2011 Order of Enforcement because he had two other appeals pending in which he challenged the actions of the Moncier I trial court and hearing panel.[14] Had he been allowed to pursue these other appeals, Mr. Moncier asserts, he would have prevailed and would not now be responsible for costs.

Mr. Moncier previously raised this argument in this Court in his May 9, 2011 response to the Board's proposed order of enforcement and also in the various motions he filed prior to entry of the June 1, 2011 Order of Enforcement. We rejected this argument then, and we remain convinced that our disposition of this issue was correct. Throughout these proceedings, Mr. Moncier has refused to recognize that "[t]he source of authority of the Board of Professional Responsibility and its functions lies in the Supreme Court." Maddux v. Bd. of Prof'l Responsibility, 288 S.W.3d 340, 343-44 (Tenn. 2009). Our duty to regulate the practice of law in this State includes "the ultimate disciplinary responsibility for violations of the rules governing the legal profession." Id.

Consistent with that duty, we reviewed the Moncier I hearing panel's judgment in accordance with Rule 9, section 8.4 before entering the June 1, 2011 Order of Enforcement.

---

[14] Mr. Moncier's appeals were Moncier v. Bd. of Prof'l Responsibility, No. E2011-01090-SC-R3-BP and Moncier v. Bd. of Prof'l Resonsibility, No. E2011-00616-R3-BP.

The pendency of Mr. Moncier's separate appeals challenging by indirect means the <u>Moncier I</u> hearing panel's judgment neither divested this Court of subject matter jurisdiction nor diminished the inherent authority of this Court to regulate the practice of law. This issue is without merit.

<u>Unconstitutional Disciplinary Process</u>

Mr. Moncier next argues that he should be relieved of costs because Tennessee's civil disciplinary proceedings do not include quasi-criminal constitutional protections mandated by the United States Supreme Court and article I, sections 8 and 9 of the Tennessee Constitution. Mr. Moncier alleges that granting him relief from costs on this basis is appropriate because the "costs are fruits of unconstitutional acts" and of a "defective civil structured disciplinary proceeding."

As support for this argument, Mr. Moncier relies primarily upon <u>In re Ruffalo</u>, 390 U.S. 544 (1968), in which the United States Supreme Court considered whether an attorney disbarred by the State of Ohio should also be disbarred from practicing in federal court. <u>Id.</u> at 550. In resolving the issue, the United States Supreme Court considered whether the Ohio disbarment process sufficiently afforded the attorney procedural due process. <u>Id.</u> The Court described disbarment proceedings as "adversary proceedings of a quasi-criminal nature." <u>Id.</u> at 551 (citation omitted). The Court explained that "disbarment . . . is a punishment or penalty imposed on a lawyer." <u>Id.</u> at 550. Thus, the lawyer is "entitled to procedural due process, which includes fair notice of the charge." <u>Id.</u> Because the Ohio disciplinary process failed to afford the lawyer notice that his conduct "would be considered a disbarment offense" until after the lawyer and another witness had testified "at length on all the material facts" pertaining to the disbarment offense, <u>id.</u> at 550-51, the Court concluded that the Ohio proceeding failed to afford the lawyer due process. <u>Id.</u> at 552. The Court reversed the judgment of the federal circuit court disbarring the lawyer from practicing in the federal courts. <u>Id.</u> at 551-52.

Mr. Moncier focuses on the phrase "quasi-criminal nature" from <u>In re Ruffalo</u> and interprets it as entitling attorneys in disciplinary proceedings to the same due process rights afforded criminal defendants. This argument goes too far. As the Colorado Supreme Court recognized, the due process rights of attorneys in disciplinary proceedings "do not extend so far as to guarantee the full panoply of rights afforded to an accused in a criminal case." <u>People v. Harfmann</u>, 638 P.2d 745, 747 (Colo. 1981); <u>see also</u> <u>In re Surrick</u>, 338 F.3d 224, 233 (3d Cir. 2003) ("[A]lthough attorney disciplinary proceedings have consequences which remove them from the ordinary run of civil cases, they are not criminal in nature." (alterations and internal quotation marks omitted)); <u>In re Palmisano</u>, 70 F.3d 483, 486 (7th Cir. 1995) (noting that <u>In re Ruffalo</u> "does not require courts to employ the procedures of the

-18-

criminal law in disbarment matters"); In re Cordova-Gonzalez, 996 F.2d 1334, 1336 (1st Cir. 1993) ("Although attorney discipline proceedings have been called quasi-criminal, the due process rights of an attorney in a disciplinary proceeding do not extend so far as to guarantee the full panoply of rights afforded to an accused in a criminal case." (citation and internal quotation marks omitted)); Rosenthal v. Justices of the Supreme Court of Cal., 910 F.2d 561, 564 (9th Cir. 1990) ("A lawyer disciplinary proceeding is not a criminal proceeding. As a result, normal protections afforded a criminal defendant do not apply." (citations omitted)).

Read as a whole, In re Ruffalo stands for the proposition that a lawyer subject to discipline is entitled to procedural due process, including notice and an opportunity to be heard. In re Ruffalo, 390 U.S. at 550. Tennessee's disciplinary process affords lawyers notice and an opportunity to be heard, as well as other protections, including the right to have counsel present, the opportunity to cross examine witnesses, and the right to present evidence. Tenn. Sup. Ct. R. 9, §§ 8.1 to 8.4. Mr. Moncier availed himself of these procedural protections in Moncier I, and his argument that relief from costs is appropriate because Tennessee has an "unconstitutionally structured attorney civil disciplinary proceeding" is without merit.

Alleged Constitutional Violations in Moncier I

Mr. Moncier alternatively argues that, even if the process in Tennessee is not constitutionally infirm, the disciplinary proceedings in Moncier I violated several rights guaranteed him by the First, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and article I, sections 8 and 9 of the Tennessee Constitution, including:

> (1) the right to pre-hearing notice of charges of misconduct;
> (2) the right to a fair and impartial hearing panel;
> (3) the right to compulsory process for documents from a person
> Disciplinary Counsel called to testify;
> (4) the right to confront and cross-examine witnesses;
> (5) the right to counsel of his choice;
> (6) the right to present a defense; and
> (7) the right to access to public and/or judicial records.

Mr. Moncier raised many of these same issues in his May 9, 2011 response to the Board's proposed order of enforcement. We found no merit in these arguments then; nonetheless, we have again carefully considered these issues in light of the record. We remain convinced that these issues are without merit and do not entitle Mr. Moncier to relief from costs. We need not again explicitly address each of these issues. However, we will briefly address Mr. Moncier's argument that Disciplinary Counsel and staff of the Board

-19-

deprived him of counsel of his choosing on December 11, 2009, in the proceedings before the Moncier I hearing panel, and that, as a result, he should be relieved from costs incurred after that date.

As support for this argument, Mr. Moncier relies on the treatment of this issue in the Moncier I trial court's September 8, 2010 order, ultimately vacated as a nullity because Mr. Moncier failed to file a sworn petition for writ of certiorari. The facts as recited in this order indicate that the Moncier I hearing panel notified Mr. Ralph Harwell, the attorney representing Mr. Moncier, of its belief that he may have violated the Tennessee Rules of Professional Conduct, see Tenn. Sup. Ct. R. 8, by representing both a Vassar co-defendant in the federal courts and Mr. Moncier during the disciplinary proceedings. The Moncier I hearing panel expressed these concerns during the course of the hearing on Friday, December 11, 2009. The Moncier I hearing panel explained that Mr. Harwell's conduct possibly created a conflict of interest or deprived Mr. Moncier of Mr. Harwell's testimony about the Vassar complaint during the disciplinary proceedings.

When the hearing reconvened on Monday, December 14, 2009, Mr. Harwell read to the Moncier I hearing panel an email he had received at 5:16 p.m. on Friday, December 11, 2009, from Rita Webb, executive secretary of the Board. The email was addressed to the Moncier I hearing panel members advising that their concerns about Mr. Harwell's possible unethical conduct, expressed on the record during the December 11, 2009 hearing, had been referred to the investigative section of the Board for handling in the ordinary course, pursuant to Rule 9, section 8.1.[15] The email further stated: "It is this office's position that [the Moncier I] hearing should proceed to conclusion on Monday, December 14." Based on this email, Mr. Harwell moved to continue the hearing and to withdraw from representing Mr. Moncier. The Moncier I hearing panel denied both motions.

In its September 8, 2010 order, the trial court admonished the Board for communicating its intent to investigate Mr. Harwell while he was actively engaged in representing Mr. Moncier before the Moncier I hearing. Nevertheless, the trial court found no prejudice resulting from the communication. The trial court described Mr. Harwell as a veteran lawyer and discerned no change in his advocacy for Mr. Moncier after he received notice of the investigation. The trial court also noted that no offer of proof had been made to show that Mr. Harwell's advocacy changed after he received the email.

---

[15] Section 8.1 requires all complaints to be "submitted in writing[,]" but authorizes the Board "to investigate information coming from a source other than a written complaint if the Board deems the information sufficiently credible or verifiable through objective means."

Mr. Moncier's assertion that the trial court found he had been deprived of his right to counsel of his choosing by the events of December 11, 2009, is simply inaccurate. Thus, Mr. Moncier is not entitled to relief from costs on this basis.

<u>Article X, Section 1 Oath Requirement</u>

Mr. Moncier next asserts that the <u>Moncier II</u> panel lacked authority to adjudicate his petition because the panel members failed to take an oath to support the United States and Tennessee Constitutions. As support for this assertion, Mr. Moncier relies upon article X, section 1 of the Tennessee Constitution, which states:

> Every person who shall be chosen or appointed to any office of trust or profit under this Constitution, or any law made in pursuance thereof, shall, before entering the duties thereof, take an oath to support the Constitution of this State, and of the United States, and an oath of office.

Tenn. Const. art. X, § 1. Mr. Moncier has cited no authority for his argument that a Board panel member occupies an "office of trust or profit" as that phrase is used in article X, section 1. A decision of this Court construing the same phrase in the ouster law, <u>see</u> Tenn. Code Ann. § 8-47-101 (2011), undercuts Mr. Moncier's argument.

In <u>State ex rel. Harris v. Buck</u>, 138 Tenn. 112, 196 S.W. 142 (1917), this Court concluded that a county engineer appointed by a county court was not holding "an office of trust or profit" as that phrase is used in the ouster statute. We explained:

> An office of trust or profit under the laws of Tennessee, within the meaning of the Ouster Act, and under our present Constitution, may be one created by the Constitution, or by an act of the General Assembly of the state within its power under the Constitution. The quarterly county court has no power to create such an office, though power may be granted to it to fill a county office after the same has been validly created by the [L]egislature.

<u>Id.</u> at 117-18, 196 S.W. at 143. The Board was established by this Court, *not* created by the Constitution or an act of the General Assembly. Applying <u>Buck</u>, we conclude that article X, section 1 does not apply because Board panel members do not occupy "an office of trust or profit," within the meaning of the constitutional provision.

-21-

## Disqualification of Hearing Panel Members

Mr. Moncier next argues that the Moncier II panel erred by denying his motions for recusal. He asks this Court to order a new hearing on his petition before either the Moncier I hearing panel or disinterested district members.

In his brief to this Court, Mr. Moncier asserts that the Moncier II panel should have granted his recusal motions because: (1) he had filed six lawsuits in state and federal courts against the Board and its members alleging violations of his constitutional rights; (2) he had filed complaints against former Chief Disciplinary Counsel Nancy Jones and current Chief Disciplinary Counsel Sandy Garrett; (3) he had filed motions seeking to recover the attorney's fees and costs he had incurred in litigating Moncier I and other related litigation. Mr. Moncier claims that because he became "embroiled" with the Board, the impartiality of the Moncier II panel was called into question.

Mr. Moncier asserts that the Tennessee Code of Judicial Conduct in effect in December 2011 applied to the Moncier II panel members and governed their decisions on his motions for recusal. See Tenn. Sup. Ct. R. 10, Canon 5.[16] Mr. Moncier has not cited any Tennessee decision holding that the Code of Judicial Conduct applies to members of a Board panel adjudicating a petition for relief from costs. We hold that it does not. The Code of Judicial Conduct in effect at the time of the Moncier II hearing applied only to any "officer of a judicial system"—lawyer or non-lawyer—who performed judicial functions.

The Board is an administrative entity, not a judicial system. As such, the Board performs various functions. For example, the Board is authorized to investigate any allegation of attorney misconduct or attorney incapacity. Tenn. Sup. Ct. R. 9, §§ 5.5(a), 8.1.[17]

---

[16] Tennessee Supreme Court Rule 10 was amended effective July 1, 2012. Mr. Moncier relies upon the following language from the version of Canon 5 in effect at the time of his December 2011 hearing:

> **Application of the Code of Judicial Conduct**
> A. Anyone, whether or not a lawyer, who is an officer of a judicial system and who performs judicial functions, including an officer such as magistrate, court commissioner, judicial commissioner, special master, divorce referee, juvenile referee, or any other referee performing judicial functions, is a judge within the meaning of this Code. All judges shall comply with this Code except as provided below.

Tenn. Sup. Ct. R 10, Canon 5 (2011 version).

[17] "All investigations, whether upon complaint or otherwise, shall be initiated and conducted by
(continued...)

The Board is empowered to adopt and submit to this Court for approval "written guidelines to ensure the efficient and timely resolution of complaints, investigations, and formal proceedings." Id.§ 5.5(b). The Board assigns district committee members "to conduct disciplinary hearings and to review and approve or modify recommendations by Disciplinary Counsel for dismissals or informal admonitions." Id. § 5.5(c). The Board reviews, at Disciplinary Counsel's request, the determination of a reviewing district committee member "that a matter should be concluded by dismissal or by private informal admonition without the institution of formal charges." Id. § 5.5(d). The Board may also privately reprimand attorneys for misconduct. Id. § 5.5(e).

The Board receives regular reports from, and conducts regular performance evaluations of, Chief Disciplinary Counsel. Id. § 7.1. Petitions initiating formal disciplinary proceedings are filed with the Board. Id. § 8.2. Once a petition and answer are filed, the Chair of the Board assigns a hearing panel to adjudicate the matter. Id. The Board reviews Disciplinary Counsel's recommendation to appeal from a hearing panel's judgment. Id. § 5.3. The Board, or a panel of the Board, hears petitions for dissolution of temporary orders of suspension, id. § 4.3, and petitions for relief from costs, id. § 24.3.

Unlike a judicial system, in which investigative, prosecutorial, and adjudicative functions are separate, some overlapping of these functions is inherent in administrative agencies, like the Board. See Withrow v. Larkin, 421 U.S. 35, 54-55 (1975) (discussing the overlapping investigatory and adjudicatory functions administrative agencies may perform); Heyne, 380 S.W.3d at 735 (discussing the overlapping functions performed by school boards in Tennessee). The Board simply is not a judicial system; thus, a Board member is not an officer of a judicial system. Mr. Moncier's argument that the 2011 version of the Tennessee Code of Judicial Conduct applied to the Moncier II panel members is without merit.

We recognize, of course, that nothing prevents us from applying the judicial disqualification standards to Board members by way of Rule 9, even though the 2011 Code of Judicial Conduct did not apply by its own terms to the Moncier II panel.[18] Indeed, Rule 9 applies judicial disqualification standards to district committee members. Tenn. Sup. Ct. R. 9, § 6.5 (stating that district committee members should not "take part in any matter in

_____

[17](...continued)
Disciplinary Counsel." Tenn. Sup. Ct. R. 9, § 8.1.

[18] Tennessee's version of the Uniform Administrative Procedures Act provides that "[a]n administrative judge, hearing officer or agency member shall be subject to disqualification for bias, prejudice, interest or any other cause provided in this chapter or for any cause for which a judge may be disqualified." Tenn. Code Ann. § 4-5-302(a) (2011).

which a judge, similarly situated, would have to recuse himself or herself.").[19] At the time of Mr. Moncier's 2011 hearing and at the present time, Rule 9 does not apply judicial disqualification standards to Board members.[20]

Furthermore, no constitutional principle mandates their application to administrative adjudicators. See, e.g., Petrowski v. Norwich Free Acad., 506 A.2d 139, 142-43 (Conn. 1986) ("The applicable due process standards for disqualification of administrative adjudicators do not rise to the heights of those prescribed for judicial disqualification."); John L. Gedid, ALJ Ethics: Conundrums, Dilemmas, and Paradoxes, 11 Widener J. Pub. L. 33, 53 (2002) ("Courts deciding due process claims have recognized that due process does not require the same standard for Article III judges and ALJs because their status, role, and functions are different. The avoidance of the appearance of bias standard is particularly unsuitable in administrative proceedings."). Indeed, as the Connecticut Supreme Court has aptly explained, many practical considerations weigh against doing so.

> The canons of judicial ethics go far toward cloistering those who become judges, the ultimate arbiters of constitutional and statutory rights, from all extraneous influences that could even remotely be deemed to affect their decisions. Such a rarefied atmosphere of impartiality cannot practically be achieved where the persons acting as administrative adjudicators, whose decisions are normally subject to judicial review, often have other employment or associations in the community they serve. It would be difficult to find competent people willing to serve, commonly without recompense, upon the numerous boards and commissions in this state if any connection with such agencies, however remotely related to the matters they are called upon to decide, were deemed to disqualify them. Neither the federal courts nor this court require a standard so difficult to implement as a prerequisite of due process of law for administrative adjudication.

---

[19] The American Bar Association's Model Rules for Lawyer Disciplinary Enforcement call for applying the judicial disqualification standards to both Board and hearing committee members. See Model Rules of Disciplinary Enforcement Rules 2(E), 3(F) (2002) (stating that Board and hearing committee members "shall refrain from taking part in any proceeding in which a judge, similarly situated, would be required to abstain").

[20] The Moncier II panel actually applied the stricter judicial disqualification standards when evaluating Mr. Moncier's recusal motions.

Petrowski, 506 A.2d at 143; see also  V-1 Oil Co. v. Dep't of Envtl. Quality, 939 P.2d 1192, 1200 (Utah 1997) ("The paralysis of basic governmental functions and the overwhelming expense caused by imposition of an uncompromising judicial model of complete structured independence of the adjudicator would have disastrous consequences for many essential governmental programs and functions.").

This does not mean, however, that a Board member is never subject to disqualification.  A basic requirement of due process is a fair trial before a fair tribunal, and this principle applies to administrative adjudicators as well as to courts.  Withrow, 421 U.S. at 46-47; Gibson v. Berryhill, 411 U.S. 564, 579 (1973); Heyne, 380 S.W.3d at 734-35 (explaining that for an administrative hearing "to be 'meaningful' in the constitutional sense, it must employ a decision-maker or decision-makers who are unbiased"); Cooper v. Williamson Cnty. Bd. of Educ., 803 S.W.2d 200, 202 (Tenn. 1990) ("It is axiomatic that due process requires the opportunity of the party charged to be heard at a meaningful time and in a meaningful manner, before an impartial tribunal.").

For purposes of constitutional due process, however, administrative adjudicators are afforded a presumption of honesty and integrity.  See Withrow, 421 U.S. at 47.  This presumption may be overcome by showing that an administrative adjudicator has a pecuniary interest in the outcome of the proceeding, or has been the target of personal abuse or criticism from the party before him, id., or has a conflict of interest, see Gibson, 411 U.S. at 578-79.  This presumption may also be overcome by showing that the "probability of actual bias" in a particular case on the part of the administrative decision-maker is "too high to be constitutionally tolerable."  Withrow, 421 U.S. at 47.  The burden of establishing a disqualifying interest rests on the party seeking disqualification. Schweiker v. McClure, 456 U.S. 188, 196 (1982).

When an assertion of bias is premised solely on an administrative adjudicator's exercise of both investigative and adjudicative functions, the party making the contention must show that, "under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented."  Withrow, 421 U.S. at 47. "[A]ny form of function combination, occurring alone and without other exacerbating biasing influences, is very unlikely to run afoul of procedural due process." Martin v. Sizemore, 78 S.W.3d 249, 265 (Tenn. Ct. App. 2001).  As the Court of Appeals explained in Martin:

A combination of prosecutorial and adjudicative functions is the most problematic combination for procedural due process purposes. A prosecutor, by definition, is a partisan advocate for a particular position or point of view.

The role is inconsistent with the objectivity expected of administrative decision-makers. Accordingly, to permit an advocate for one party to act as the legal advisor for the decision-maker creates a substantial risk that the advice given to the decision-maker will be skewed. However, the risk of bias becomes intolerably high only when the prosecutor serves as the decision-maker's advisor in the same or a related proceeding.

78 S.W.3d at 265 (internal citations omitted); see also Heyne, 380 S.W.3d at 735 (holding in a school disciplinary proceeding that a school official's dual role of prosecutor and decision-maker did not without more rise to the level of a violation of due process); see also People v. Varallo, 913 P.2d 1, 5 (Colo. 1996) (collecting cases that apply this principle in the attorney disciplinary context); Goldstein v. Comm. on Practice of the Supreme Court, 995 P.2d 923, 498-501 (Mont. 2000) (same); cf. Marshall v. Jerrico, Inc., 446 U.S. 238, 250 (1980) ("[T]he strict requirements of neutrality cannot be the same for administrative prosecutors as for judges, whose duty it is to make the final decision and whose impartiality serves as the ultimate guarantee of a fair and meaningful proceeding in our constitutional regime."). We shall therefore apply the foregoing principles to determine whether the Moncier II panel abused its discretion or denied Mr. Moncier due process by denying his recusal motions.

First, no member of the Moncier II panel, or any other Board member, had a pecuniary interest in the outcome of Mr. Moncier's petition for relief from costs. Board members are not compensated for their services and receive only reimbursement "for their travel and other expenses incidental to the performance of their duties." Tenn. Sup. Ct. R. 9, § 5.4.

Second, the various lawsuits Mr. Moncier filed in federal and state courts against the Board and Board members do not establish that the Moncier II panel, or other Board members, were biased against him. Mr. Moncier has not alleged that these lawsuits involved personal insults or personal criticism of Board members. Not even the stricter judicial disqualification standards require recusal merely because a litigant dissatisfied with a judge presiding over his or her lawsuit files a separate lawsuit against the judge. See Farm Credit Bank of St. Paul v. Brakke, 512 N.W.2d 718, 720-21 (N.D. 1994) (collecting cases); see also Robinson v. State, 719 S.E.2d 601, 617-18 (Ga. Ct. App. 2011) (holding that the trial judge named by a criminal defendant as a defendant in a federal lawsuit did not err by refusing to recuse himself from the criminal); Regnante v. Ind. Dept. of Revenue, 691 N.E.2d 1229, 1230-31 (Ind. Ct. App. 1998) (holding that a state trial judge named by a civil litigant as a defendant in a federal lawsuit did not err by denying recusal motion); State v. Blankenship, 685 N.E.2d 831, 833 (Ohio. Ct. App. 1996) (holding that a state trial judge against whom a post-conviction petitioner filed a disciplinary complaint did not err by denying the post-conviction petitioner's recusal motion); cf. Grievance Adm'r v. Fieger, 719 N.W.2d 123, 149

(Mich. 2006) (finding that justices against whom federal lawsuits had been filed by an attorney subjected to disciplinary proceedings were not enmeshed with the attorney to the extent requiring recusal, even though the justices had sought sanctions against the attorney in the federal proceedings). The Moncier II panel exhibited no hostility toward Mr. Moncier during the proceedings on his petition for relief from costs and allowed him broad leeway during the hearing, both as to the grounds he presented for relief and as to the presentation of his testimony.

Third, the Board's discussions with Disciplinary Counsel and its own lawyer about the separate litigation involving Mr. Moncier establishes neither bias nor a constitutionally intolerable potential for actual bias. These discussions pertained to *separate* litigation, *unrelated* to Mr. Moncier's petition for relief from costs. Cf. Martin, 78 S.W.3d at 265 (stating that "the risk of bias becomes intolerably high only when the prosecutor serves as the decision-maker's advisor *in the same or a related* proceeding" (emphasis added)). That the Board denied Mr. Moncier's separate request for reimbursement of the attorney's fees and costs he had incurred in Moncier I and voted to institute proceedings to revoke his probation for failing to comply with the June 1, 2011 Order of Enforcement also does not establish that the Moncier II panel was biased. These Board actions also were unrelated to Mr. Moncier's petition for relief from costs and again illustrate only that the Board is an administrative entity which performs multiple, overlapping functions. As already explained, the Board's performance of these overlapping functions does not, without more, establish bias or a constitutionally intolerable risk of actual bias.

Finally, the December 6, 2011 letter Mr. Moncier received from Board Chair Lela Hollabaugh also does not establish bias. Ms. Hollabaugh was originally named as a member of the Moncier II panel to hear the petition for relief from costs. However, a September 1, 2011 notice designated another Board member to serve in her place and stated that Ms. Hollabaugh had a conflict of interest which prevented her continued service.[21] The text of Ms. Hollabaugh's December 6, 2011 letter is reproduced below:

> I am in receipt of your "motions" submitted to Ms. Webb on December 2nd and 4th. For purposes of our communications, "the Board" is defined as the 12 members of

---

[21] In an affidavit attached to the Board's response to Mr. Moncier's September 26, 2011 motion to disqualify the Moncier II panel, Ms. Hollabaugh stated that Mr. Moncier had requested that she recuse herself from various matters in which he was involved. By a letter to Mr. Moncier dated August 31, 2011, Ms. Hollabaugh agreed to "step aside" from the Moncier II hearing panel, even though she believed she could fairly consider Mr. Moncier's petition for relief from costs.

the Board of Professional Responsibility appointed by the Supreme Court.

As you have been advised in the past, you are welcome to attend our administrative session that is open to the public, but you will not be permitted to address the Board at our December 9th meeting. You will also not be permitted to "record" our administrative session. The report and recommendation of Magistrate Judge Shirley, that you seek to discuss with the Board, has not been adopted by Judge Varlan and is not final. Accordingly, the issue of the Board appointing a practice monitor is not yet before us.

Your repeated requests that the Board not communicate with Nancy Jones and Talmage Watts are groundless. You fail to recognize that the Board is the entity authorized by the Supreme Court, through its Chief Disciplinary Counsel, to pursue charges of disciplinary violations. *In this context, which applies to all the matters currently pending that you are personally involved, the Board is the adversary party. The Board is not a hearing panel or a fact finder. The Board is not sitting in the role of a judge or court. In this role, the Board will continue to communicate with its lawyers and those communications are privileged, as you have recognized.*

(Emphasis added.) Even though Ms. Hollabaugh did not serve on the <u>Moncier II</u> panel, Mr. Moncier touts her December 6, 2011 letter as proof positive that the <u>Moncier II</u> panel, and all members of the Board, were biased against him and considered him their adversary. We disagree.

The letter must be read as a whole and "adversary" understood in context. The term appears in a paragraph responding to Mr. Moncier's "repeated requests" that the Board not communicate privately with Chief Disciplinary Counsel and the attorney representing the Board in the various state and federal lawsuits Mr. Moncier had filed against it. Ms. Hollabaugh emphasized that, with respect to those proceedings, the Board was not sitting as a hearing panel, a fact finder, or in the role of a court or judge, but as an "adversary party." She explained that the Board would continue to communicate with Chief Disciplinary Counsel as necessary to perform its duties and with its own attorney as to matters in which the Board is the "adversary party." The letter reiterates the Board's nature as an administrative entity with various overlapping functions to perform. The letter does not refer

to Mr. Moncier's petition for relief from costs and does not establish that the <u>Moncier II</u> panel was biased against Mr. Moncier.

Finally, Mr. Moncier's suggestion that the Board should have assigned a panel of three district members to hear his petition is without merit. Mr. Moncier failed to overcome the presumption of honesty and integrity afforded administrative adjudicators and establish any disqualifying interest. Additionally, the Board was not at liberty to ignore the text of Rule 9, section 24.3 in favor of a procedure Mr. Moncier preferred.

We conclude that the <u>Moncier II</u> panel did not abuse its discretion or deprive Mr. Moncier of due process by denying his recusal motions.

Discovery and Requests for Subpoenas

Prior to the December 13, 2011 hearing on his petition, Mr. Moncier served Disciplinary Counsel with notices of depositions and asked for production of the following documents at the depositions:

> (1) The Board's minutes and votes regarding assessment of Mr. Moncier's costs;
> (2) The Board's policies and procedures from September 2006 to the present;
> (3) The Board's authorization to file for review of the [September 8, 2010] judgment of the trial court in <u>Moncier I</u>; and
> (4) The Board's authorization to file for review of the hearing panel's judgment in <u>Moncier I</u>.

On September 20, 2011, the Board responded to the notices and moved for a protective order,[22] arguing that the requests were not relevant to Mr. Moncier's petition for relief from costs, not reasonably calculated to lead to admissible evidence, and outside the scope of Rule 9, section 24. Mr. Moncier responded, stating his wish "to establish by discovery that Disciplinary Counsel did not petition the Board to assess costs and the Board never performed its duty to assess costs." On September 22, 2011, the <u>Moncier II</u> panel granted the Board's motion for a protective order, explaining that Rule 9, section 24.3 does not permit discovery in support of a petition for relief from costs and that Mr. Moncier's

---

[22] Mr. Moncier's notices were not filed with the Board and do not appear in the record but are referenced in other filed documents, including the Board's response and motion.

stated purpose for discovery was unrelated to the issue raised by the petition and not reasonably calculated to lead to admissible evidence.

Four days later, Mr. Moncier filed with the Board an application for issuance and service of subpoenas *ad testificatium* and *duces tecum*, which, if issued, would have required the testimony of Ms. Jones and Ms. Garrett, as well as the production of various documents, including those requested in Mr. Moncier's notice of depositions. On October 14, 2011, the Moncier II panel denied the application, explaining that Mr. Moncier was seeking by the subpoenas to retry Moncier I and continue "his litigious assault on the disciplinary system." Despite these rulings, at the December 13, 2011 hearing, Mr. Moncier attempted to call Ms. Garrett as a witness. Ms. Garrett objected, and the Moncier II panel sustained the objection.

In this appeal, Mr. Moncier argues that the Moncier II panel arbitrarily denied his discovery requests and attempt to call Ms. Garrett as a witness and erroneously allowed Ms. Garrett to make an unsworn statement at the hearing. Specifically, Mr. Moncier alleges Ms. Garrett was allowed to testify that the costs assessment does not reflect the actual costs incurred in Moncier I because she failed to include all the time she had spent investigating one of the claims against Mr. Moncier. Mr. Moncier contends that the Moncier II panel based its denial of his petition on Ms. Garrett's unsworn statement, which, according to Mr. Moncier, is unfair because he was not allowed to engage in discovery or call Ms. Garrett as a witness.

After reviewing the transcript of Ms. Garrett's statement, as well as the judgment of the Moncier II panel, we discern no basis for concluding that the Moncier II panel abused its discretion by denying Mr. Moncier's discovery requests. Additionally, Ms. Garrett's statement was made during the course of argument; nothing suggests the Moncier II panel viewed it as testimony. Contrary to Mr. Moncier's assertion, the Moncier II panel's denial of his petition did not rest on Ms. Garrett's statement.

## Non-Constitutional Grounds for Relief from Costs

In his final issue, Mr. Moncier lists a number of "non-constitutional petitions" that he says entitle him to relief from costs.[23] Most of these "non-

---

[23] The list includes the following claims:

(1) The chairperson of the Moncier II panel admitted that Rule 9 should be amended to clarify the roles of Disciplinary Counsel and the Board;
(2) Disciplinary Counsel admitted that Mr. Moncier was provided only a civil disciplinary proceeding and providing a quasi-criminal proceeding would require

(continued...)

-30-

a rule change;

(3) The Board's cost invoice includes charges for work on all ten charges, even though the Board prevailed before the Moncier I hearing panel on only five charges, two of which were reversed by the Moncier I trial court order later vacated based on Cawood;

(4) Relief from costs is appropriate as an offset to the attorneys' fees and costs Mr. Moncier incurred successfully defending seven of the ten charges in Moncier I;

(5) After entry of the June 1, 2011 Order of Enforcement, Mr. Moncier successfully defended against a petition to revoke his probation;

(6) The standardless provisions of Rule 9 fail to specify the conditions or define the role of probation monitors;

(7) Disciplinary Counsel interfered with the independence and impartiality of the Moncier I hearing panel;

(8) Disciplinary Counsel and the Board "should have abstained from taking advantage of Cawood's unforeseeable change in pleading requirements for judicial review to strip [him] of a favorable judgment . . .;"

(9) Disciplinary Counsel opened an ethical investigation of Mr. Moncier's attorney during the Moncier I hearing and did not provide Mr. Moncier an opportunity to obtain new counsel of choice who was not facing ethical charges or an investigation;

(10) Mr. Moncier is "actually innocent" of the finding of the Moncier I hearing panel that he had a conflict of interest in the Vassar matter;

(11) Mr. Moncier was "exonerated of all the accusations of United States District Court Judge Greer except asking the question, "may I speak to my client;"

(12) Mr. Moncier has lost 70% of his income since the federal suspension on April 29, 2008, and has been required to borrow approximately $750,000 to maintain his law practice;

(13) Mr. Moncier was found not guilty of the contempt charge in the Daniel matter;

(14) Mr. Moncier had no meaningful opportunity to be heard in Moncier II because Rule 9, section 24.3 has no standards by which to determine whether relief is appropriate;

(15) The Moncier II panel erred in holding "that Cawood had anything to do with [Mr. Moncier's] constitutional claim that [he] cannot be required to pay attorney's fees and costs for proceedings that were unconstitutional because of conduct of Disciplinary Counsel and the Board;"

(16) The lack of standards by which to evaluate petitions for relief from costs caused the Moncier II panel to "place too much emphasis upon the Order of Enforcement;"

(17) The standardless discretion afforded the Moncier II panel to determine what would and would not be relevant to a claim for relief from costs;

(18) The Board's protocol memorandum in Moncier I did not request a monetary judgment, other appeals were pending, the Board did not assess costs, and there was no notice or opportunity to be heard before this Court assessed the costs;

(19) The Moncier II panel stated that "the expense of defending one's self from

(continued...)

-31-

constitutional petitions" have already been either explicitly or implicitly considered and rejected herein. Nonetheless, we have carefully considered each and every one of these "non-constitutional petitions" and again conclude that none entitles Mr. Moncier to relief from costs.

The Moncier II panel provided the following clear and cogent explanation of why no reduction of costs was warranted based on Mr. Moncier's arguments that some of the alleged disciplinary violations were not proven and that he was found actually innocent of the conflict of interest charge.

> The [Moncier II p]anel also does not find that the difference in the number of charges sustained at different points in the [Moncier I] proceeding to be of significance in evaluating whether [Mr. Moncier] is entitled to relief from the costs assessed. In [Moncier I] all of the charges arose from two different complaints which will be referred to hereinafter for simplicity as the Judge Greer and the Judge Workman matters. Although there was a difference between the description of Mr. Moncier's alleged Tennessee Rules of Professional Conduct ("RPC") infractions found in the [p]etition for [d]iscipline (Judge Greer's report) and the [s]upplemental [p]etition for [d]iscipline (Judge Workman's report) and the findings of the [Moncier I h]earing [p]anel, both as regard the salient facts and the pertinent RPC sections, the [Moncier I h]earing [p]anel found RPC violations in both the Greer and Workman matters. There was little or nothing in the record before the [Moncier II p]anel to suggest that the amount of time spent to prepare or to

---

[23](...continued)
disciplinary proceedings is not a basis for relief from costs";
(20) The Moncier II panel rejected extreme financial hardship as a reason to grant relief from costs;
(21) The Moncier II panel incorrectly observed that the payment of costs was a condition of Mr. Moncier resuming the practice of law;
(22) The Moncier II panel improperly relied upon this Court's June 1, 2011 Order of Enforcement;
(23) Rule 9, section 24.3 is flawed because it requires an inferior body, such as the Moncier II panel, to review a judgment of the Tennessee Supreme Court; and
(24) The Moncier II panel "was not authorized to create any of the foregoing reasons to deny [him] standardless relief."

present either the Greer or the Workman matters had a direct relationship to the number of RPC violations found to be sustained by the [Moncier I h]earing [p]anel. Ms. Garrett argued that nothing in the record provided a basis for separating the time spent on one charge, or RPC violation, from another. In this respect, Mr. Moncier's [p]etition can be factually distinguished from other petitions for Rule 24.3 relief where the disciplinary action was brought based on several discrete transactions for some of which the attorney was found not to have violated any of the Rules of Professional Conduct. The [p]anel rejects the suggestion that a strict pro rata reduction in costs is appropriate based on a comparison between the number of RPC violations initially made, and those found to be sustained, without consideration of the specific facts and whether the time spent is similarly divisible. The [p]anel further rejects the suggestion that any such comparison should include the reduction in RPC "Charges" initially found by Judge Kurtz since that [September 8, 2010] [o]rder was held by him to be a nullity. We would further note that Mr. Moncier made numerous affirmative defenses to the charges brought against him in his responses to the [p]etition for [d]iscipline and [s]upplemental [p]etition for [d]iscipline [in Moncier I], which responses are exhibits in this matter. Disciplinary Counsel had to prepare to defend or rebut all of these defenses in addition to proving the charges, regardless of the number of RPC violation allegations ultimately sustained or found.

The [Moncier II p]anel specifically finds that the amounts of time and the out[-]of[-]pocket costs recorded, upon which the Supreme Court's [June 1, 2011 o]rder was based, were fair and reasonable in light of the complexity of the issues presented and the multi-day length of the proceedings before the [Moncier I h]earing [p]anel.

We can add little to this explanation, except to point out that the final costs assessed against Mr. Moncier were incurred on March 7, 2011, two days *before* the Board submitted its proposed order of enforcement to this Court. Since the commencement of these proceedings, the Board has not amended its request to seek any additional costs incurred after March 2011. Thus, Mr. Moncier *has not been* assessed the expenses and costs Disciplinary Counsel incurred in obtaining the June 1, 2011 Order of Enforcement or in litigating the

multiple lawsuits, motions, petitions, and appeals Mr. Moncier filed in various venues after the trial court granted the Board's Rule 60.02 motion on February 18, 2011. Given the litigation tidal wave Mr. Moncier has unleashed since that time, these unassessed costs and expenses are likely substantial.

We affirm the Moncier II panel decision denying relief from costs based on Mr. Moncier's "non-constitutional" petitions.

## Conclusion

Having reviewed the record and the nine issues raised, we conclude that the Moncier II panel's findings, inferences, conclusions and decisions were not (1) in violation of constitutional or statutory provisions; (2) in excess of the panel's jurisdiction; (3) made upon unlawful procedure; (4) arbitrary or capricious or characterized by abuse of discretion or a clearly unwarranted exercise of discretion; or (5) unsupported by evidence which is both substantial and material in the light of the entire record. Accordingly, the judgment of the Moncier II panel denying Mr. Moncier's petition for relief from costs is affirmed. Costs of this appeal are taxed to Mr. Moncier and his surety, for which execution may issue, if necessary.

_____
CORNELIA A. CLARK, JUSTICE