# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
September 8, 2016 Session

## WILLIAM THOMAS MCFARLAND v. MICHAEL S. PEMBERTON ET AL.

**Appeal by Permission from the Court of Appeals**
**Chancery Court for Roane County**
**No. 2014105 Jon Kerry Blackwood, Senior Judge**

———————————————————

**No. E2014-02176-SC-R11-CV – Filed September 20, 2017**

———————————————————

CORNELIA A. CLARK, J., dissenting.

I cannot join the majority's decision affirming the dismissal of William Thomas McFarland's election contest lawsuit. No statute expressly authorizes a county election commission to convene a quasi-judicial hearing and resolve a pre-election challenge to a circuit judge candidate's satisfaction of constitutional residency requirements.[1] Furthermore, the majority's conclusion that county election commissions *implicitly* have such authority ignores the fact that, where the General Assembly intends for a county election commission to exercise such authority, it has enacted statutes expressly providing such authority. The majority compounds this error by applying its holding recognizing *implicit* authority in a manner that negates a statute *explicitly* granting Mr. McFarland the right to file this election contest lawsuit challenging Michael S. Pemberton's satisfaction of constitutional residency requirements. Because the majority's decision is inconsistent with relevant statutes, with longstanding decisions of this Court, and with commonsense, practical considerations, I dissent.

---

[1] See Tenn. Cons. art. VI, § 4 (providing that every candidate for circuit judge "shall before his election, have been a resident . . . of the circuit or district [for] one year").

## I. Factual and Procedural Background

On February 3, 2014, Mr. Pemberton filed his candidate nominating petition for circuit court judge of the Ninth Judicial District with the Roane County Election Commission ("Election Commission").[2]  On March 31, 2014, Willis Hall, a resident of the Ninth Judicial District and voter in Roane County, obtained, completed, and filed a complaint with Election Commission.  Mr. Hall asserted that Mr. Pemberton's name should not be placed on the August 7, 2014 ballot because he had not satisfied the constitutional one-year district residency requirement and was, therefore, not qualified.

As the majority notes, in response to Mr. Hall's complaint, the Election Commission "conducted an independent investigation to determine whether Mr. Pemberton" had satisfied the residency requirement.  The Election Commission "set the matter for a public hearing at its regular meeting on April 28, 2014."  Notice of the hearing was published in a local newspaper.  Mr. Hall and Mr. Pemberton had no right to discovery, but they were allowed to submit written materials to the Election Commission, and before the hearing they submitted U-Haul receipts, vehicle registration documents, voter registration documents, Mr. Pemberton's driver's license, and copies of his utility bills.  As the majority notes, these documents are not included in the record on appeal.  Mr. Hall and Mr. Pemberton also submitted briefs, legal authorities, and affidavits to the Election Commission, but not all of these documents are included in the record on appeal.

 A certified court reporter attended the public hearing on April 28, 2014, and the record on appeal includes a transcript of the public hearing.  Mr. McFarland did not participate in the hearing in his official capacity as Roane County Attorney, citing a conflict of interest.  The Election Commission retained another attorney to attend the public hearing "only [to] answer questions from the [Election Commission] itself and only pertaining to legal matters."  Mr. McFarland also did not participate in the public hearing in his capacity as a candidate opposing Mr. Pemberton in the election for circuit court judge.

---

[2] See Tenn. Code Ann. § 2-5-104 (2014) (stating that a candidate, other than a candidate in a statewide election, an election for representative to the United States Congress, or an election for municipal office, must "file the candidate's original nominating petition with the chair or the administrator of elections of the county election commission in the county in which the candidate is a resident and [must] file certified duplicates of the nominating petition with the chairs or administrators of the county election commissions in all counties wholly or partially within the area served by the office" the candidate is seeking).

Mr. Hall retained counsel for the hearing, but Mr. Pemberton represented himself. The Tennessee Coordinator of Elections, Mark Goins, the Assistant Coordinator of Elections, Beth Henry Robertson, and an attorney, Cara Hart, attended the public hearing via speakerphone. At the beginning of the hearing, the Roane County Administrator of Elections, at the request of the chair of the Election Commission, read aloud Tennessee Code Annotated section 2-2-122—the statute that specifies the factors relevant to establishing and determining residency for purposes of the election statutes—"so [that] everybody understands what we are talking about here."

Mr. Hall and Mr. Pemberton each were allotted fifteen minutes to speak to the Election Commission, and Mr. Hall's attorney spoke on his behalf, while Mr. Pemberton spoke for himself. Mr. Hall's attorney and Mr. Pemberton discussed the legal test the Election Commission should apply to determine the issue and referenced prior decisions of this Court and of the Court of Appeals. The speakers were not placed under oath, and cross-examination was not allowed. Only the members of the Election Commission, the Roane County Administrator of Elections, and the State Coordinator of Elections were allowed to question speakers. Mr. Hall was not allotted time to reply to Mr. Pemberton's statement.

The Election Commission allowed members of the public present at the public hearing to speak as well, so long as they registered their wish to do so. These so-called "secondary speakers" were each allotted three minutes to speak, but they were not placed under oath, and cross-examination was not allowed. All of these secondary speakers supported Mr. Pemberton. At least two of these speakers, Mr. Pemberton's wife and sister-in-law, were lawyers and spoke about the legal test the Election Commission should apply in determining the residency issue.

At the end of the public hearing, the Election Commission voted unanimously to place Mr. Pemberton's name on the ballot, but it offered no explanation for its decision. There is no indication in the record on appeal that the Election Commission entered any order or judgment reflecting its determination.[3] Instead, later that same day, April 28, 2014, the Election Commission certified the ballot in Roane County listing Mr. Pemberton and Mr. McFarland as the only two candidates for circuit court judge of the Ninth Judicial District.[4]

---

[3] Although statements at the public hearing indicate the Election Commission's decision was included in the minutes of the meeting, the minutes are not included in the record on appeal.

[4] Mr. Pemberton was also listed on the ballot in the other counties making up the Ninth Judicial District.

On May 16, 2014, Mr. Hall filed a *quo warranto* action and a complaint for declaratory judgment in the Chancery Court for Roane County, asking the trial court to declare Mr. Pemberton disqualified based on his failure to satisfy the constitutional residency requirement. Mr. Hall also argued that the Election Commission's vote to place Mr. Pemberton on the ballot constituted "an exercise of power not conferred by law and/or being conducted outside the laws and regulations governing elections, and, therefore, invalid and void *ab initio.*" Mr. Hall later moved to amend the complaint to include a petition for writ of certiorari pursuant to Tennessee Code Annotated section 27-9-101 (2014). On July 23, 2014, the Chancery Court entered an order memorializing Mr. Hall's voluntary dismissal of his *quo warranto* action, dismissing Mr. Hall's declaratory judgment action for lack of standing, and denying his motion to amend, reasoning that the amendment would be futile because Mr. Hall was not a party "aggrieved" by the Election Commission's decision, within the meaning of section 27-9-101. Mr. Hall did not appeal the ruling.

Mr. McFarland, who, again, did not participate in the public hearing in any capacity, also did not attempt to seek judicial review of the Election Commission's determination. Rather, he raised questions about Mr. Pemberton's satisfaction of the residency requirement throughout the campaign, describing it on one occasion as an issue "for the voters to decide."

The election occurred on August 7, 2014, and Mr. Pemberton received the most votes. The election results were certified on August 15, 2014, and five days later,[5] on August 20, 2014, Mr. McFarland filed this lawsuit. Mr. McFarland cited Tennessee Code Annotated section 2-17-101, which provides, in relevant part, that "[t]he incumbent office holder *and any candidate for the office* may contest the outcome of an election for the office." Tenn. Code Ann. § 2-17-101(b) (2014) (emphasis added). Mr. McFarland's complaint named as defendants Mr. Pemberton, the five members of the Election Commission in their official capacities, and Mark Goins in his official capacity as the Tennessee Coordinator of Elections. The sole basis for Mr. McFarland's election contest lawsuit was his allegation that Mr. Pemberton had failed to satisfy the constitutional residency requirement and was not qualified for the position of circuit judge for the Ninth Judicial District. Mr. McFarland asserted that raising the issue in an election contest lawsuit was appropriate, and as support for this assertion, he cited Hatcher v. Bell, 521 S.W.2d 799 (Tenn. 1974). Mr. McFarland asked the trial court to declare the election void, citing Tennessee Code Annotated sections 2-17-112 and 2-17-113. These statutes authorize a court to enter a judgment in an election contest lawsuit "[d]eclaring the election void," Tenn. Code Ann. § 2-17-112 (2014), and provide that "[i]f the person whose election is contested is found to have received the highest number of legal votes,

---

[5] Tenn. Code Ann. § 2-17-105 ("The complaint contesting an election under § 2-17-101 shall be filed within five (5) days after certification of the election.").

*but the election is declared null by reason of constitutional disqualifications on that person's part* or for other causes, *the election shall be declared void*." Id. § 2-17-113 (emphasis added).

In separate motions, Mr. Pemberton and the Election Commission asked the trial court to dismiss Mr. McFarland's complaint and/or grant them summary judgment. They argued that Mr. McFarland's complaint, although styled as an election contest lawsuit, was in substance a collateral attack upon, or attempt to appeal, from the Election Commission's determination that Mr. Pemberton's name should be placed on the ballot, despite Mr. Hall's challenge to Mr. Pemberton's satisfaction of the residency requirement. Having reframed the lawsuit in this manner, the defendants argued that Mr. McFarland's appeal was untimely because it was not filed within sixty days of the Election Commission's determination.

As support for this argument, the defendants relied upon Tennessee Code Annotated sections 27-9-101 and 102. These statutes provide as follows:

> **27-9-101. Right of review.** — Anyone who may be aggrieved by any final order or judgment of any board or commission functioning under the laws of this state may have the order or judgment reviewed by the courts, where not otherwise specifically provided, in the manner provided by this chapter.

> **27-9-102. Filing and contents of petition.** — Such party shall, within sixty (60) days from the entry of the order or judgment, file a petition of certiorari in the chancery court of any county in which any one (1) or more of the petitioners, or any one (1) or more of the material defendants reside, or have their principal office, stating briefly the issues involved in the cause, the substance of the order or judgment complained of, the respects in which the petitioner claims the order or judgment is erroneous, and praying for an accordant review.

Tenn. Code Ann. §§ 27-9-101, -102 (2014).

The trial court held a hearing on the motions, but the record on appeal does not include a transcript of that hearing. Ultimately, the trial court agreed with the defendants, ruling that the Election Commission's April 28, 2014 determination was subject to judicial review by way of a petition for writ of certiorari under sections 27-9-101 and -102. The trial court agreed with the defendants that Mr. McFarland's lawsuit was time barred because it was not filed within sixty days of the Election Commission's determination. The Court of Appeals affirmed. This Court granted Mr. McFarland's timely filed application for permission to appeal. The majority now affirms the

judgments of the courts below. For the reasons herein explained, I cannot join the majority's decision.

## II. Standard of Review

The material facts are undisputed, and the resolution of this case involves questions of law and depends upon the interpretation and application of statutes and prior judicial decisions. De novo review applies, and a presumption of correctness does not apply to the decisions of the courts below. Tennessean v. Metro. Gov't of Nashville, 485 S.W.3d 857, 862-63 (Tenn. 2016).

In construing statutes, the primary objective of appellate courts is to determine and effectuate legislative intent and purpose. Mills v. Fulmarque, Inc., 360 S.W.3d 362, 368 (Tenn. 2012). The statutory text is of central importance, and the words used must be given their natural and ordinary meaning in the context in which they appear and in light of the statute's general purpose and the entire statutory scheme. Griffin v. Campbell Clinic, P.A., 439 S.W.3d 899, 903 (Tenn. 2014). "Statutes relating to the same subject or sharing a common purpose must be construed in a manner that 'advance[s] their common purpose or intent.'" Id. (quoting Carver v. Citizen Utils. Co., 954 S.W.2d 34, 35 (Tenn. 1997)). "[A court's] ultimate goal is to select a reasonable construction that avoids statutory conflict and provides for harmonious operation of the laws." Id. (internal quotation marks and alterations omitted). Appellate courts avoid construing a statute in a manner that unduly restricts or expands the statute's coverage. Bryant v. Baptist Health Sys. Home Care of E. Tenn., 213 S.W.3d 743, 748 (Tenn. 2006) (citing Houghton v. Aramark Educ. Res., Inc., 90 S.W.3d 676, 678 (Tenn. 2002)); Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995)). "Courts may supply words when reasonably called for. Nevertheless, it is the prerogative of the legislature, and not the courts, to amend statutes." City of Knoxville v. Entm't Res., LLC, 166 S.W.3d 650, 658 (Tenn. 2005) (internal quotation marks and alterations omitted). "Just as we may not overlook or ignore any of the words in a statute, we must be circumspect about adding words to a statute that the General Assembly did not place there." Coleman v. State, 341 S.W.3d 221, 241 (Tenn. 2011) (internal citation omitted). "'[W]here the legislature includes particular language in one section of a statute but omits it in another section of the same act, it is generally presumed that the legislature acted purposefully in the subject included or excluded.'" In re Kaliyah S., 455 S.W.3d 533, 554 (Tenn. 2015) (quoting State v. Pope, 427 S.W.3d 363, 368 (Tenn. 2013)).

In applying these rules to the statutes at issue in this appeal, it is also important to remember that the Election Commission, like other governmental departments and agencies, has "no inherent or common-law power" and is "purely a creature[] of statute." State ex rel. Com'r of Transp. v. Med. Bird Black Bear White Eagle, 63 S.W.3d 734, 768-69 (Tenn. Ct. App. 2001), perm. app. denied (Tenn. Dec. 10, 2001). As such, the Election Commission has "only those powers expressly granted by statute and *those*

*powers required by necessary implication to enable [it] to fulfill [its] statutory mandate.*" Id. at 769 (emphasis added) (citing Sanifill of Tenn., Inc. v. Tenn. Solid Waste Disposal Control Bd., 907 S.W.2d 807, 810 (Tenn. 1995); Tenn. Pub. Serv. Comm'n v. S. Ry., 554 S.W.2d 612, 613 (Tenn. 1977)). Application of these principles reveals the fatal flaws in the majority's analyses.

## III. Analysis

### A. *Authority of County Election Commissions*

The General Assembly has not enacted any statute explicitly authorizing county election commissions to convene quasi-judicial hearings to resolve challenges to a candidate's satisfaction of constitutional residency requirements. However, the General Assembly has enacted a statute explicitly providing that, where a county administrator of elections refuses to accept an application for voter registration, the applicant may appeal the administrator's decision to the county election commission. Tenn. Code Ann. § 2-2-125(a)-(b) (2014). This statute very specifically provides the procedures and times governing the challenge and the appeal. It requires the administrator to "tell the registrant the reason" the application was rejected and to "write the reason on the back of the original permanent registration record." Id. § 2-2-125(a). The administrator also must "tell the registrant that the registrant has a right to appeal the decision to the commission within ten (10) days and offer the registrant an appeal form." Id. § 2-2-125(b). The statute expressly declares that "[t]he action of the [county] commission on the registrant's application for registration on appeal shall be a final administrative action." Id. § 2-2-125(c). "If the commission determines, after notice and hearing for the appellant, that the appellant was not entitled to register, the commission shall give the appellant a *written* statement of its reasons for so holding." Id. § 2-2-125(d) (emphasis added). Finally, the statute provides that "[i]f the commission believes that the appellant has violated the law in registering," the commission must "report the matter to the grand jury and the district attorney general." Id. § 2-2-125(e). These statutes illustrate that when the General Assembly intends to confer quasi-judicial authority on county election commissions, it does so explicitly, by providing a detailed and specific procedural framework to circumscribe the authority it confers.[6] The General Assembly has not

---

[6] Other election statutes also illustrate that when the General Assembly intends for election officials to exercise quasi-judicial authority, it provides such authority expressly. See Tenn. Code Ann. § 2-11-202(a)(5)(B) (2014) (describing the authority the Coordinator of Elections has when investigating the administration of election laws and conferring on the Coordinator of Elections the power to issue subpoenas, summon witnesses, administer oaths, take depositions, compel the production of documents, exhibits, records, and things, and require testimony on any issue related to the investigation); Tenn. Code Ann. § 2-12-209(c) (describing the process that applies when a county election commission files a petition with the Coordinator of Elections concerning the county legislative body's failure to appropriate funds for the county election commission at a level comparable to previous years).

explicitly conferred any quasi-judicial authority on a county election commission to determine a candidate's satisfaction of constitutional residency requirements.[7] This Court should apply the well-established rule of statutory construction and presume that the General Assembly acted intentionally when it explicitly conferred quasi-judicial authority on county election commissions to determine voter registration appeals and purposefully chose not to confer such authority on a county election commission to determine a candidate's satisfaction of constitutional residency requirements when it failed to enact a statute doing so. See In re Kaliyah S., 455 S.W.3d at 554.

By judicially clothing county election commissions with such authority in the absence of a statute, the majority's decision gives rise to many practical problems. For example, county election commissions have no power to compel witnesses to testify, no obligation to place persons who speak under oath, no obligation to permit interested parties to engage in discovery, no power to compel discovery, no procedural framework for quasi-judicial hearings, including no defined standard of proof, no defined evidentiary rules, no guidance on whether such a decision must be reduced to writing or may be given orally, and no guidance on creating a record. Additionally, where, as here, a person is seeking an office that includes more than one county, it is not clear whether each county election commission within the district has implicit authority to determine the candidate's satisfaction of constitutional residency requirements or only the candidate's county of residence. Certainly no statute addresses this issue. Given the specific guidance the General Assembly has provided elsewhere throughout the election code, the majority's decision creating these uncertainties is inconsistent with the overall statutory scheme.

The majority's decision allowing a county election commission to determine this issue is also incongruent with another statute that evinces the General Assembly's intent for courts, not county election commissions, to determine whether a candidate has satisfied constitutional residency requirements. See Tenn. Code Ann. § 2-5-101(g)(1)(E) (2014) (describing the process for replacing a candidate who "[i]s declared ineligible or disqualified *by a court* or disqualified by the political party executive committee under § 2-5-204" after the qualifying deadline (emphasis added)); see also Comer v. Ashe, 514 S.W.2d 730, 736 (Tenn. 1974) ("We digress to point out that Tennessee has no statute precisely prohibiting the candidacy of an ineligible or disqualified candidate, however, *implicit in our law is the right of the courts to make such determination on a case by case*

---

[7] To be sure, county election commissions have ministerial authority to determine whether a candidate has met statutory qualification requirements, such as submission of a nominating petition in the proper form, Tenn. Code Ann. § 2-5-102, or filing a nominating petition by the statutorily prescribed deadline, id. § 2-5-101, or listing the proper licenses needed for particular offices on the nominating petition, id. § 2-5-106. These ministerial duties are easily accomplished without the exercise of quasi-judicial authority, which no statute confers upon county election commissions.

*basis and under appropriate circumstances*." (emphasis added)).  The majority disagrees that section 2-5-101(g)(1)(E) evinces the General Assembly's intent to vest courts, rather than election commissions, with the authority to determine a candidate's residency qualifications, noting that the statute does not specify the body that must declare a candidate ineligible.  But this is precisely my point!  Had the General Assembly intended to vest county election commissions with the authority to make a ruling on a candidate's qualifications or eligibility, it would not have limited its description of the process that is to be used for replacing disqualified or ineligible candidates to candidates declared "ineligible or disqualified *by a court* or disqualified by the political party executive committee*)*."  Tenn. Code Ann. § 2-5-101(g)(1)(E) (emphasis added).

Indeed, the General Assembly's decision not to grant such quasi-judicial authority to county election commissions is entirely consistent with a century of precedent from this Court holding that the authority of county election commissions is ministerial only. City of Memphis v. Shelby Cnty. Election Comm'n, 146 S.W.3d 531, 535 (Tenn. 2004) ("[A]s ministerial officers, the [County Election] Commission and the [State Election] Coordinator have limited discretion."); id. at 539 n.7 (describing the Shelby County Election Commission as "a non-judicial, ministerial body"); Shelby Cnty. Election Comm'n v. Turner, 755 S.W.2d 774, 776 (Tenn. 1988) ("[T]he Election Commission has only ministerial duties."); Peeler v. State ex rel. Beasley, 231 S.W.2d 321, 323 (Tenn. 1950) ("Except in so far as some discretion is reposed in the commission to reconcile, if it can, inconsistencies or contradictions appearing on the face of the returns, the duties of this commission are entirely ministerial."); Curtis v. State ex rel. Moreland, 43 S.W.2d 391, 393 (Tenn. 1931) ("It is not controverted but that the duties of the election commissioners, as a canvassing board, are ministerial in character, and as such subject to the writ of mandamus."); Taylor v. Carr, 141 S.W. 745, 750 (Tenn. 1911) ("The duties of the commissioners of election are only ministerial.").  Because county election commissions are creatures of statute, the General Assembly clearly has the prerogative to make the choice it has and to withhold from them the authority to convene quasi-judicial hearings and make determinations about a candidate's satisfaction of residency requirements.

Moreover, the General Assembly's decision to withhold such quasi-judicial authority from county election commissions is consistent with the entire statutory scheme. County election commissions are partisan by statutory design, and their members are appointed by another body that is partisan by statutory design—the state election commission.  Tenn. Code Ann. §§ 2-12-101, -103 (2014).  Three members of each county election commission are appointed by the members of the majority party on the state election commission, while two members of each county election commission are appointed by the minority party on the state election commission.  Id. § 2-12-103(b). Persons appointed to a county election commission must be registered voters who have been residents of Tennessee for five years and residents of the county for which they are appointed for two years.  Id. § 2-12-102(a)(1).  Legal knowledge or training is not

required for appointment to county election commissions. Commissioners serve two-year terms, until their successors are appointed and qualified. Id. § 2-12-101(a). The state election commission has the authority to remove a commissioner who becomes unqualified and discipline or remove a commissioner for cause. Id. § 2-12-101(b). Given the partisan nature of county election commissions, the brief terms commissioners serve, the lack of any requirement for legal knowledge or training, and the ability of the state election commission to discipline members of county election commissions, the General Assembly's decision not to imbue county election commissions with quasi-judicial decision making authority about a candidate's satisfaction of constitutional residency requirements is entirely reasonable and is, in fact, a wise policy choice.

I do not question the General Assembly's right to make a policy choice. My conclusion that county election commissions do not have such authority is grounded on the utter lack of statutory authority conferring such authority on them, and on the potential conflicts that may result from the majority's decision judicially granting such authority.

To support its holding that county election commissions are *implicitly* imbued with such authority, the majority relies on a statute that requires the Tennessee Coordinator of Elections to "[e]nsure that all election commissions within the state shall prohibit any person from becoming qualified to have such person's name placed on any ballot wherein such person is seeking to be nominated or elected to an office for which such person is ineligible." Tenn. Code Ann. § 2-11-202(a)(12). The majority's reliance is misplaced. This statute is a mandate to the Coordinator of Elections, not to county election commissions. As such, this statute cannot serve as a proper basis for conferring *implicit* authority on county election commissions. As already noted, the Election Commission has "only those powers expressly granted by statute and *those powers required by necessary implication to enable [it] to fulfill [its] statutory mandate.*" Med. Bird Black Bear White Eagle, 63 S.W.3d at 768 (emphasis added). Because this statute is not a mandate to county election commissions, it cannot be a proper basis for *implicit* authority.

It is true, as the majority points out, that county election commissions are charged with printing ballots "on which shall be only the names of candidates who have qualified and who are to be voted on at the polling place in which the ballots are to be used." Tenn. Code Ann. § 2-5-202 (2014). But this statute cannot be read in isolation. In the context of the election statutes, "qualified," in section 2-5-202, simply refers to a candidate who has filed a nominating petition that meets the statutory requirements and deadlines. See id. § 2-5-101(a) (stating that "[c]andidates shall *qualify* by filing all nominating petitions . . . by the deadlines set out in the schedule in this section" (emphasis added)); id. § 2-5-102 (prescribing the form and requirements for nominating petitions). Moreover, even assuming the term "qualified" in section 2-5-202 is not limited to the context in which it appears, where doubts exist about a candidate's

satisfaction of qualification requirements, county election commissions may file a declaratory judgment action and ask a court to decide. See Jordan v. Knox Cty., 213 S.W.3d 751, 765 (Tenn. 2007) (stating that the Knox County Election Commission had standing to seek a declaratory judgment from the trial court as to the eligibility of the individuals who had submitted qualifying petitions for re-election). Nothing in this statute authorizes or implicitly requires county election commissions to convene quasi-judicial hearings to make this determination. Contrary to the majority's assertion, reading statutes in context is not unusual but is one of the rules courts ordinarily apply when engaged in statutory construction.

Furthermore, another statute requires county election commissions to submit sample ballots to the Coordinator of Elections for approval. Id. § 2-5-206(c) (2014) (requiring county election commissions to "prepare a sample ballot of all candidates and mail this sample ballot to the coordinator of elections for approval"). "No ballot shall be printed or funds expended" for printing ballots until the Coordinator of Elections approves or disapproves a sample ballot, which must occur "within ten (10) days of the [Coordinator of Elections'] receipt of the sample ballot." Id. Candidates, candidate representatives, and other parties with standing have the right to "apply to the chancery court in the county wherein the allegedly defective ballot may be used, for any appropriate relief" under the election code or the rules of civil procedure. Id. § 2-5-206(d). Unlike the majority, I am fully confident in the ability of courts to expedite lawsuits related to elections and issue any other appropriate and necessary orders to ensure that elections are not disrupted. Considered in context, these statutes impose duties and responsibilities on the Coordinator of Elections and cannot properly serve as the basis for clothing county election commissions with quasi-judicial powers by implication.[8]

For all these reasons, I would hold that the Election Commission lacked authority to convene a quasi-judicial hearing to determine Mr. Pemberton's satisfaction of constitutional residency requirements.

---

[8] The statute on which the majority relies, Tenn. Code Ann. § 2-11-202(a)(12), actually addresses the Coordinator of Elections' responsibility to ensure that county election commissions not allow persons *ineligible* for office to become qualified for placement on the ballot. A person may be qualified for an office, having satisfied residency, age, and other constitutional requirements, but nevertheless be ineligible for the office for another reason. See, e.g., Tenn. Code Ann. 8-18-101(1)-(4) (2016) (enumerating matters that render a person ineligible to hold office); Id. § 2-5-101(f) (describing circumstances where it is "unlawful" for candidates to qualify). But even if this statute concerns qualifications rather than ineligibility, it is a mandate to the Coordinator of Elections, and as such, cannot serve as a basis for conferring authority by implication on county election commissions.

### B. Review by Petition for Writ of Certiorari was not Available

Even assuming, for argument's sake, that the Election Commission has implicit authority to convene a quasi-judicial hearing to determine a candidate's satisfaction of constitutional residency requirements, however, the majority errs by concluding that the Election Commission did so here and that its decision was subject to judicial review by way of a petition for writ of certiorari.[9]

Nothing about the public hearing the Election Commission held resembled a quasi-judicial hearing. The Election Commission did not receive testimony from witnesses who were placed under oath and were subject to cross-examination. Rather, it allotted time for oral presentations from a lawyer representing a citizen and a candidate. Only members of the Election Commission, the Roane County Administrator of Elections, and the Coordinator of Elections were permitted to ask questions. The Election Commission accepted and considered unauthenticated documents Mr. Hall and Mr. Pemberton presented before the hearing, but they had no opportunity to engage in discovery, nor did they have any opportunity during the public hearing to counter or impeach these documents. Neither Mr. Hall nor Mr. Pemberton had the right to control the presentation of information to the Election Commission. Rather, the Election Commission permitted anyone who attended the public hearing to make a three-minute oral presentation, but again, none of these speakers was placed under oath or subject to cross-examination.

Furthermore, the public hearing lacked the appearance of impartiality essential to judicial and quasi-judicial proceedings. During the hearing, members of the Election Commission referred to Mr. Pemberton by his first name, and at least one member of the Election Commission disclosed his friendship with Mr. Pemberton. The Election Commission announced rules at the beginning of the hearing but did not abide by those rules strictly, allowing Mr. Pemberton's wife to speak twice, despite the three-minute limitation, and allowing another secondary speaker who supported Mr. Pemberton to make comments about the costs of electricity in an effort to bolster Mr. Pemberton's explanation of the utility bills Mr. Pemberton had submitted before the hearing. After this secondary speaker spoke, the Chair of the Election Commission reminded the secondary speakers to limit their "remarks to residency," and remarked, "I let [the previous speaker] get away with it, and I've known him a long time." These comments and the manner in which this hearing was conducted call into question the impartiality of the Election Commission. Impartiality is *the* bedrock principle of the judicial system,

---

[9] To be clear, I view this hearing as entirely unauthorized, but in the interest of responding to the majority's analysis, I have addressed why, even if it is assumed the Election Commission had authority to convene a quasi-judicial hearing, the hearing in this case fails entirely to satisfy even the minimal requirements of due process, such as an impartial adjudicator and notice and opportunity to be heard.

and any hearing purporting to be quasi-judicial *must* include an impartial decision maker. See Moncier v. Bd. of Prof'l. Responsibility, 406 S.W.3d 139, 161 (Tenn. 2013) ("A basic requirement of due process is a fair trial before a fair tribunal, and this principle applies to administrative adjudicators as well as to courts."); Smith v. State, 357 S.W.3d 322, 342 (Tenn. 2011) ("The principles of impartiality, disinterestedness and fairness are fundamental concepts in our jurisprudence." (internal quotation marks omitted)).

The Election Commission also did not issue a judgment or order after the public hearing. No authority need be cited because no one contends that the Election Commission entered a judgment or order. Rather, the Election Commission simply voted to place Mr. Pemberton's name on the ballot and certified the ballot as final on the same day the hearing occurred. The Chair of the Election Commission indicated that the decision would be included in the minutes and that the documents submitted on the issue and a letter from the Coordinator of Elections would be appended to the minutes. The minutes are not included in the record on appeal, nor does the record indicate when, or if, those minutes were adopted. Additionally, nothing in the record indicates that Mr. Hall was advised of any right to appeal the determination, and indeed, when he attempted to obtain judicial review, his appeal was dismissed for lack of standing and because he was not an aggrieved party. Finally, nothing in the record indicates that Mr. McFarland was advised that he could seek judicial review of the Election Commission's determination. The majority concludes that the Election Commission was not obliged to advise Mr. McFarland of his legal rights with respect to this decision, noting that Mr. McFarland is an attorney and served as county attorney at the time. But, again, the majority ignores the foundational legal principle that parties in judicial or quasi-judicial proceedings are entitled to minimal due process, and courts universally recognize that minimal due process consists of notice and an opportunity to be heard. Moncier, 406 S.W.3d at 153 ("Two of the 'essential requirements of due process . . . are notice and an opportunity to respond.'" (quoting Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1985)); Cooper v. Williamson Cnty. Bd. of Educ., 803 S.W.2d 200, 202 (Tenn. 1990) ("It is axiomatic that due process requires the opportunity of the party charged to be heard at a meaningful time and in a meaningful manner, before an impartial tribunal."). Mr. McFarland did not forfeit these minimal due process rights by becoming a lawyer.

Given all these circumstances, I have no idea how anyone, particularly someone who did not participate in the hearing, could have discerned that the Election Commission's public hearing was a quasi-judicial hearing, and that judicial review of the Election Commission's determination could be obtained by filing a petition for writ of certiorari, despite the fact that no order or judgment had been entered. Indeed, the statute governing judicial review by way of a petition for writ of certiorari expressly presupposes that the board or commission decision under review will be reflected in a final order or judgment. Again, the statute provides:

- 13 -

> Anyone who may be aggrieved by *any final order or judgment* of any board or commission functioning under the laws of this state *may have the order or judgment reviewed by the courts*, where not otherwise specifically provided, in the manner provided by this chapter.

Tenn. Code Ann. § 27-9-101 (emphasis added). Indeed, the sixty days for seeking review by way of a petition for writ of certiorari actually runs from the date of "entry of the order or judgment." Id. § 27-9-102. Since the Election Commission did not enter an order or judgment that triggered the running of the sixty-day period, the majority's determination that Mr. McFarland's lawsuit is untimely is inexplicable.

Therefore, even if it has implicit authority to do so, I do not agree that the Election Commission actually convened a quasi-judicial hearing or produced an order or judgment from which Mr. McFarland could have obtained judicial review by way of a petition for writ of certiorari.[10]

### C. Election Contest Lawsuit Remains Available

Finally, even accepting for argument's sake that the Election Commission had authority to convene and did convene a quasi-judicial hearing and that Mr. McFarland could have sought review of the Election Commission's determination by way of a petition for writ of certiorari, the majority still errs by depriving Mr. McFarland of his separate and explicit statutory right to bring an election contest lawsuit. The statutes *expressly* affording candidates the right to bring an election contest lawsuit do not condition this right upon the county election commission not having decided the issue before the election. Rather, Tennessee Code Annotated section 2-17-101(b) provides: "The incumbent office holder and any candidate for the office may contest the outcome of an election for the office." Another statute plainly identifies challenges to the constitutional qualifications of the winning candidate as a proper basis for an election contest action and requires courts to declare the election void when an election contest succeeds on that basis. See Tenn. Code Ann. § 2-17-113 (2014) ("If the person whose election is contested is found to have received the highest number of legal votes, but the election is declared null by reason of constitutional disqualifications on that person's part or for other causes, the election shall be declared void." (emphasis added)). No provision of this comprehensive statutory scheme conditions the right to file an election contest upon the county election commission not having previously determined the issue.

---

[10]  If the Election Commission had decided the issue the other way, then logically, under the majority's holding, Mr. Pemberton, too, would have been limited to seeking review of the Election Commission's determination by way of a petition for writ of certiorari. This would also represent a departure from established Tennessee law, which permits a candidate to file a lawsuit in chancery court to compel an election commission to place the candidate's name on the ballot. See, e.g., State ex rel. Sonnenburg v. Gaia, 717 S.W.2d 883 (Tenn. 1986).

Additionally, more than thirty years ago this Court confirmed that a losing candidate has a right to contest the election based on a winning candidate's lack of constitutional qualifications, even if other avenues for challenging the candidate's lack of qualifications are available. Hatcher v. Bell, 521 S.W.2d 799, 803 (Tenn. 1974) ("We hold, therefore, that an election contest is a proper proceeding to test the validity of an election on the charge that the candidate receiving the highest number of votes cast in the election has not complied with the residence requirement set forth in the Constitution and was ineligible on the day of the election to hold the office; and that the appellee, being a candidate in the election, is a proper party to institute the proceeding."). The Hatcher Court rejected the argument that a *quo warranto* action was the exclusive means of challenging a successful candidate's qualification, stating:

> Appellant has cited us to several cases where this court has approved the bringing of a quo warranto action to challenge the eligibility of a successful candidate to hold the office to which he was elected. We have no quarrel with these decisions. *However, there is no basis in reason why the same circumstance—that is, the constitutional disqualification of the candidate receiving the highest number of votes in an election—can not be the predicate of an election contest as well as a quo warranto proceeding, depending on the party filing, the ultimate purpose of the proceeding, and the time of filing.* The circumstance, if proven, would be determinative of the validity of the election, which is the target of an election contest. It also would be determinative of the right of the successful candidate to hold the office to which he is elected, the target of a quo warranto proceeding. *The election contest statute gives to the unsuccessful candidate the right to contest the validity of the election by suit filed within ten days of the election, without limitation to any specific ground or grounds of contest. We are not inclined to restrict judicially the grounds of contest to eliminate therefrom a challenge to the validity of an election predicated on the constitutional disqualification of the successful candidate at the time of election.* To do so would leave the unsuccessful candidate without any effective remedy by which he might challenge the validity of the election.

Hatcher, 521 S.W.2d at 802-03 (citations omitted and emphasis added). The Hatcher Court's rationale applies with even greater force here. "[T]here is no basis in reason why the same circumstance—that is, the constitutional disqualification of the candidate receiving the highest number of votes in an election—cannot be the predicate of an election contest as well as a [quasi-judicial hearing before the Election Commission]." Id. No statute requires candidates to seek a pre-election determination of an opponent's satisfaction of constitutional residency requirements from a county election commission. No statute provides that if a citizen seeks such a determination, any candidate who disagrees with the determination must seek judicial review of it by way of a petition for writ of certiorari. No statute provides that any candidate who does not seek judicial

- 15 -

review of the county election commission's determination of a citizen's complaint will be precluded from bringing an election contest action raising the same issue. Even though the General Assembly has chosen not to enact these statutes restricting a candidate's right to bring an election contest, the majority's decision writes these restrictions into Tennessee law, and in doing so, the majority has implicitly overruled Hatcher. The majority denies that its decision amounts to an overruling of Hatcher and attempts to distinguish Hatcher on the facts. But the Court's holding in Hatcher had nothing at all to do with the facts of the case and everything to do with the language of the statute. The statutory language then and now clearly and unambiguously grants unsuccessful candidates the unlimited right to bring an election contest action challenging the successful candidate's satisfaction of constitutional residency requirements. This right is not conditioned upon a showing that an election commission has not already considered and decided the issue.

In the face of this clear and unambiguous language, I cannot join the majority in judicially amending statutes to restrict a candidate's right to bring an election contest when the General Assembly has chosen not to adopt these restrictions in the thirty years since Hatcher. Statutes expressly provide Mr. McFarland with the right to bring this election contest lawsuit after the election. Providing candidates with this post-election option makes sense as a practical matter. A candidate may raise the residency issue during the election, as Mr. McFarland did here, but litigating in court during the middle of campaigning is difficult for all parties. If the candidate wins the election, expending resources on a challenge to his opponent's satisfaction of residency requirements will be unnecessary. Waiting until after the election may also lessen the disruptive effect of the lawsuit because the General Assembly has provided specific procedures and an expedited schedule for litigating and resolving election contest lawsuits and has included strict and short deadlines for filing the complaint, for holding the trial, and for rendering the decision. See Tenn. Code Ann. § 2-17-105 through -110. Indeed, had this lawsuit proceeded according to the schedule statutorily provided for election contests, as it should have done, it would have been resolved long ago on the merits.[11]

Therefore, although I strongly disagree with the majority's conclusions regarding the Election Commission's implicit authority, even if the majority is correct on those points, those holdings still provide no justification for the majority's decision to deprive Mr. McFarland of his separate and express statutory right to bring an election contest lawsuit challenging Mr. Pemberton's satisfaction of constitutional residency

---

[11] I have no idea how this case would be decided on the merits were Mr. McFarland's election contest lawsuit allowed to proceed, and I am not at all suggesting that the outcome would be different. I also am not unaware of or unsympathetic to the questions and problems that could result were Mr. McFarland's lawsuit ultimately successful on the merits. Nevertheless, my role, and the role of this Court, is to interpret, not rewrite, the statutes the General Assembly has enacted. In my opinion, Tennessee statutes afford Mr. McFarland the right to bring this election contest lawsuit.

requirements.  Until and unless the General Assembly enacts a statute declaring that a county election commission's determination of that issue supersedes a candidate's right to file an election contest and limits the candidate to seeking review of the election commission's determination by a petition for writ of certiorari, I am unwilling to read those restrictions into the election contest statutes.  The majority's decision to do so is inconsistent with the express language of the election contest statutes, with this Court's holding in Hatcher, and with this Court's obligation to avoid interpreting statutes in a manner that expands or restricts their plain language.

## IV.  Conclusion

For all these reasons, I dissent from the majority's decision.  I would reverse the decisions of the courts below and remand for further proceedings in accordance with the expedited schedule provided in the election contest statutes.

I am authorized to state that Justice Lee concurs in this dissent.


_____
CORNELIA A. CLARK, JUSTICE